The STATE of Delaware, ex rel., M. Jane BRADY, Attorney General, State of Delaware, Plaintiff,

v.

PETTINARO ENTERPRISES, a Delaware general partnership, Pettinaro Construction Co. Inc., a Delaware Corporation, Verino Pettinaro, Gregory Pettinaro, Tracy Crowley, Cindy Wilkinson, and Victoria Pettinaro, Defendants.

C.A. No. 297–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 7, 2005.
Decided: March 22, 2005.

Olha N.M. Rybakoff, Esquire, Michael A. Undorf, Esquire, and Barbara J. Gadbois, Esquire, State of Delaware, Department of Justice, Wilmington, Delaware, Attorneys for Plaintiff.

Neal C. Belgam, Esquire, Andrea J. Faraone, Esquire, and Alisa E. Moen, Esquire, Blank Rome LLP, Wilmington, Delaware, Attorneys for Defendants.

## MEMORANDUM OPINION

STRINE, Vice Chancellor.

In March 2004, the Attorney General brought this action on behalf of the State of Delaware seeking redress for certain allegedly improper acts, almost all of which occurred over a half-decade before this suit was filed. As will be seen, the lack of alacrity in bringing this suit is fatal to many of the State's claims.

The targets of the Attorney General's action are defendant Pettinaro Enterprises, a real estate development company, and several of its affiliates, who were also named as defendants (collectively, "Pettinaro"). Pettinaro built the Towne Estates Condominium complex (the "Condominiums") on the west side of Wilmington in the late 1980s. At the same time, Pettinaro built a recreational facility called the Towne Estates Clubhouse (the "Clubhouse"), which was similar in design to the buildings in the Condominium complex, on an adjacent property.

The Clubhouse was not part of the Condominium property, however. Although Pettinaro sold many of the Condominium units, it retained exclusive ownership of the Clubhouse. But the Attorney General alleges that Pettinaro's conduct clouded the question of who owned the Clubhouse. For example, it is alleged that Pettinaro granted Condominium residents free and essentially unlimited access to the pool and health club facilities at the Clubhouse, even providing some residents with keys to the Clubhouse building. Relatedly, although somewhat contradictorily, Pettinaro is alleged to have offered free lifetime memberships to the Clubhouse facilities as incentives to some Condominium purchasers and limited-duration memberships to

others. Nonetheless, the Attorney General alleges that Pettinaro's failure to enforce any membership requirements or otherwise limit the residents' access to the Clubhouse served to sustain the residents' perceptions that they possessed either an ownership interest in or a promise of ongoing access to the Clubhouse. From 1989 until 2000, Pettinaro allegedly published advertisements suggesting that the Clubhouse was integral to the Condominium complex and that owners would, on some terms, be able to use the facilities in that building.

But, in 1998 or early 1999, Pettinaro closed the Clubhouse down and excluded Condominium owners from using any of its facilities, including the health club. In 2000, Pettinaro leased the Clubhouse to a third party, which reopened the building as a for-profit health club in 2001, with access available only to paying members. The Attorney General first received complaints concerning Pettinaro's marketing of the Condominiums in March 2001. In 2003, the third party leasing from Pettinaro discontinued its operations and the Clubhouse was closed permanently. Afterwards, Pettinaro transferred ownership of the Clubhouse property to the Oblates of St. Francis de Sales. The Oblates now operate a parochial school on the Clubhouse property.

The Attorney General finally brought this action on March 8, 2004, three years after first receiving consumer complaints related to the Condominium and more than five years after Pettinaro discontinued its operation of the Clubhouse. In her pleading, the Attorney General accuses Pettinaro of breaching a laundry list of consumer protection statutes and purports to seek injunctive relief, civil penalties, unpaid registration fees, and restitution for harm allegedly done to Condominium residents. The crux of the complaint is that Pettinaro falsely led Condominium owners and potential purchasers to believe that the Clubhouse was part of the common area of the Condominium complex, or, at the very least, falsely promised that Condominium residents would have access to the Clubhouse on certain terms and for certain periods. The Attorney General alleges that, in either case, Pettinaro misled consumers and otherwise engaged in conduct that violated Delaware's Consumer Fraud Act,[1] Deceptive Trade Practices Act,[2] and Health Spa Regulation statute.[3]

Pettinaro responded to the complaint with a motion seeking dismissal on a number of grounds. This opinion addresses that motion.

Initially, I conclude that, under 6 *Del. C.* § 2506, a five-year statute of limitations explicitly applies to actions brought by the State under the Consumer Fraud Act and the Deceptive Trade Practices Act. That limitation period bars most of the claims under those Acts asserted here. Per my discernment of the General Assembly's intent and the teaching of *Sohn v. Waterson*,[4] that limitation period applies retroactively to claims predating its enactment, with the five-year period running from the date of enactment as to those pre-existing claims. Relatedly, I also find that there is no basis for tolling the statute of limitations until the Attorney General received consumer complaints alerting her to Pettinaro's alleged misconduct. The alleged violations were not concealed in any way—in fact, they were blatantly obvious. To

1. 6 *Del. C.* §§ 2511–2527.

2. 6 *Del. C.* §§ 2531–2536.

3. 6 *Del. C.* §§ 4201–4222.

4. 17 Wall. 596, 84 U.S. 596, 21 L.Ed. 737 (1873).

the extent that the Attorney General wishes to exercise her authority in a passive manner, relying on aggrieved consumers to report violations of consumer protection statutes, she runs the risk that the failure of those consumers to promptly bring such violations to her attention may limit her ability to timely file actions on their behalf. That is largely what occurred here. Notably, it is also apparent that the Attorney General did not pursue this case vigorously once complaints were filed, waiting three years to follow up on those complaints before finally bringing suit—over conduct that, by that time, had long since ceased.

By contrast, the State's claims under Delaware's Health Spa Regulation law are not time-barred because no specific statute of limitation has been enacted to limit actions brought by the State under that statute. Although Pettinaro claims that this enforcement action under that statute is brought by the Attorney General simply to protect the State's proprietary interests, I reject that argument, concluding that the Attorney General is acting here to vindicate the public interests the Health Spa Regulation was enacted to protect. Those interests include ensuring that health spa operators provide their customers with statutorily-defined consumer protections and support, through the required financial contribution, the enforcement regime set up to implement those laws—in short, precisely those public interests that Pettinaro is alleged to have violated.

The last major issue I decide is that the State has failed to state a claim for injunctive relief. The State's tardiness in bringing suit, and the earlier failure of the Condominium owners to seek any injunctive relief on their own behalves, have rendered it far too late for this court to use its equitable powers of compulsion. As a practical matter, it is difficult to imagine what type of injunctive relief could be ordered to remedy the violations complained of here, other than perhaps ordering Pettinaro to reacquire the Clubhouse and operate it as a health club in fulfillment of its alleged obligations to Condominium owners who were promised lifetime access. A judicial order of that kind at this late date would rather obviously involve a misapplication of the injunctive tool, a tool that should be exercised with special sensitivity.

Here, the Attorney General admits that she is in no fair position to ask for a mandatory injunction requiring Pettinaro to buy back the Clubhouse and open it for use by Condominium owners. Rather, she claims she is entitled to an injunction prohibiting Pettinaro from violating the various consumer statutes by conduct of this kind in the future. Yet, she has failed to plead any facts indicating any threat of such a recurrence or indicating why her power to enforce consumer affairs statutes as to future acts of non-compliance is not fully adequate. A request for a loose and unfocused injunction of this kind—i.e., not to violate the law in the future—does not invoke this court's equitable jurisdiction. Because I find that there is no viable request for an injunction, two important implications follow: 1) the State's time-barred claims under the Deceptive Trade Practices Act must be dismissed on an additional ground, as that Act only applies if the State has a basis for seeking injunctive relief; and 2) there is no equitable jurisdiction to hear the remaining claims in this case. As a consequence of the second implication, this case will be dismissed unless the State transfers the case under 10 *Del. C.* § 1902 within thirty days.

## I. *Factual Background*

The facts considered in this motion to dismiss are as alleged in the State's com-

plaint and the documents the complaint incorporates.

Pettinaro purchased land in Wilmington, Delaware in 1986 at the site of the old Wilmington General Hospital. Pettinaro divided it into two parcels, developing the Towne Estates Condominium complex (with 111 residential units) on the first parcel and the Clubhouse (with separate pool and health club facilities) on the second parcel. The buildings comprising the Condominium complex and the Clubhouse building were constructed as components of a unified development scheme. The similarity of design and close proximity of the Clubhouse to the other Condominium buildings created the appearance of a single development, and more importantly, the State alleges, continuity of ownership. Nevertheless, the owners of the Condominium property and the Clubhouse property were not the same. Although ownership of the Condominium property was divided between Pettinaro and the subsequent purchasers of Condominium units, Pettinaro retained exclusive ownership of the Clubhouse property. The Clubhouse was never, at any time, a common element of the Condominium property or owned by Condominium owners as Condominium property.

Irrespective of that fact, the Attorney General alleges that Pettinaro led Condominium buyers and renters into believing otherwise. When Pettinaro first began selling Condominium units in 1989, it seems to have had a version of the cool apartment complex in Melrose Place in mind.[5] The sign on the Condominium property indicated to prospective purchasers that they would have access to a "YEAR ROUND POOL/HEALTH CLUB."[6] Brochures stated "Towne Estates features a beautifully landscaped wooded plot with ample provision for on-site parking. A fully equipped health club that includes swimming pool, saunas, weight-room, and aerobics facilities is located on-site for the utmost in convenience."[7] Other advertising materials contained references to "EXCLUSIVE AMENITIES," noting that "Memberships [are] available for on-site recreation/health club, featuring: year round use of indoor swimming pool, sauna, weight and exercise rooms, men's and women's showers and locker rooms, clubroom with kitchen, lounge areas and outdoor patio."[8]

Put simply, that Condominium owners would have access to the Clubhouse was a feature of Pettinaro's marketing strategy. Some purchasers were told that they would have lifetime access to the Clubhouse for no charge as a benefit of purchasing; others were told that their Condominium dues covered access to the Clubhouse; and many, if not all, came to believe that the Clubhouse was part of the Condominium complex and existed solely for use by Condominium residents.

Whether due to the absence of Heather Locklear or to the particular neighborhood in Wilmington in which the Condominiums were located, Pettinaro's sales of Condominium units were sluggish. In the first year, it sold 37 units. After that, sales fell off and Pettinaro concentrated for a time on simply renting out the Condominiums, most of which it still owned. In 1996, Pettinaro again began an initiative to sell units. Pettinaro was somewhat successful and sold enough units so that it no longer

5. Of course, this would have been a dreamy premonition on Pettinaro's part, as that television confection was not first broadcast until 1992.

6. Complaint ¶ 24(A).

7. Complaint ¶ 24(B).

8. Complaint ¶ 24(D).

held a majority of the units itself. Nonetheless, by 1998 it still owned 37 units, which it continued to rent out.

The State alleges that Pettinaro's marketing activities towards renters and purchasers continued to be deceptive, as its marketing materials did not disclose that the Clubhouse was not part of the common area of the Condominium complex, and Pettinaro continued to use the availability of access to the pool and health club at the Clubhouse as a marketing tool in its sales and rental efforts. During this period, it is alleged that Pettinaro led residents to believe that the Clubhouse was theirs by giving them keys, failing to enforce any membership entrance requirements, permitting residents to rent out the Clubhouse for private functions, and holding meetings with residents there.

According to the complaint, this period of easy access came to an abrupt halt sometime at the end of 1998 or the beginning of 1999. At that time, Pettinaro ceased operating the Clubhouse as a recreational facility/health spa and closed the building to residents. By any sensible standard, this action constituted notice that should have prompted reasonable residents to inquire into the true status of the Clubhouse and act to enforce whatever rights they possessed against Pettinaro with respect to the use of the Clubhouse. For example, those residents who believed that they held lifetime memberships at the Clubhouse health club were by then clearly aware that the promises they relied upon were being breached. Despite the obviousness of Pettinaro's conduct, it appears that no resident sued Pettinaro or filed a complaint with the Attorney General at that time.

As an aside, the facts surrounding the closing of the Clubhouse do not necessarily suggest any original sinister motive or moral shortcoming on the part of Pettinaro. Intuitively, I tend to doubt that Pettinaro advertised the Clubhouse as part of a preplanned scheme to defraud. It seems far more likely that Pettinaro, originally envisioning a Melrose Place in West Wilmington, had every intention of providing ongoing access to the Clubhouse, but that these good intentions gave way to a less glamorous economic reality in which the Clubhouse could no longer be profitably operated. A deal is a deal, however, and regardless of Pettinaro's initial intent in offering lifetime memberships to its health club facilities, it allegedly failed to live up to its side of those deals when it closed the Clubhouse.

In January 2000, Pettinaro leased the Clubhouse to a third party, Freestyle Ltd. In March 2000, Pettinaro took down an old rental/for sale sign on the Condominium property that indicated that a year round pool and health club were available to unitholders. The failure to remove the preexisting sign (it had been there since 1996) is the only fact in the complaint suggesting any attempt by Pettinaro after closing the Clubhouse to advertise to new purchasers or renters any right of access to the Clubhouse.

In 2001, Freestyle began operating the Clubhouse as a "health spa" under the name Delaware Swim and Fitness. From the time it was initially closed in 1999 until it was opened again in 2001, the Clubhouse was inaccessible to Condominium owners. Although the circumstances surrounding Freestyle's reopening of the Clubhouse were not addressed in the · complaint, it seems reasonable to infer that Delaware Swim and Fitness did not honor Pettinaro's "lifetime memberships," and perhaps angered Condominium residents by denying them access to the facilities unless they purchased new memberships. Like the earlier shut-down of the Clubhouse, the change of management, and any attendant

denial of access, was hardly a secret—it was blatantly obvious. Yet, no resident brought suit against Pettinaro.

In March 2001, however, the Attorney General received its first consumer complaint about Pettinaro's conduct relating to the Clubhouse. Nevertheless, the years 2001 and 2002 passed without a suit being brought by the Attorney General.

In 2003, Freestyle ceased operating the Clubhouse as a health spa. Pettinaro then transferred ownership of the Clubhouse property to the Oblates of St. Francis de Sales. The Oblates now utilize the Clubhouse property in their operation of a parochial school.

The year 2003 passed without suit being brought by the Attorney General.

Not until March 8, 2004, more than five years after Pettinaro closed down the Clubhouse and more than five years after any of the residents had last been granted access to the Clubhouse, did the Attorney General bring this suit.

In the complaint, the Attorney General alleges that Pettinaro's conduct violated three consumer protection statutes.

First, the complaint alleges that Pettinaro violated the Consumer Fraud Act, 6 Del. C. §§ 2511–2527, by, among other things:

- Advertising, marketing, and/or promoting the sale or rental of units at the Towne Estates Condominium complex in a manner that misled or tended to mislead consumers into believing that the Clubhouse was part of or a common element of the complex;
- Concealing the actual ownership status of the Clubhouse from prospective and actual purchasers and renters;

- Advertising, marketing, and/or promoting the sale or rental of units at the Towne Estates Condominium complex in a manner that misled or tended to mislead consumers into believing that residents would have access to the Clubhouse if they purchased a unit;
- Closing the Clubhouse and failing to provide residents the access they had been previously promised.[9]

The primary section of the Consumer Fraud Act that the State relies upon is § 2513(a), which prohibits the employment of any affirmative deception, false promise, or misrepresentation, or any concealment, suppression, or omission of a material fact in connection with the sale, lease, or advertisement of any merchandise. This prohibition applies to the sale, lease, or advertisement of real estate.[10]

Second, the State alleges that Pettinaro violated the oddly-named "Health Spa Regulation," 6 Del. C. §§ 4201–4222. The alleged violations are based on, among other things:

- Pettinaro's operation of a health club at the Clubhouse from 1989 until late 1998 or early 1999 without registering the health club as a "health spa" with the Director of the Division of Consumer Protection (in violation of § 4203) and without paying annual fees into the Health Spa Guaranty Fund (in violation of § 4204).
- Pettinaro's non-compliance with provisions of §§ 4205, 4206, 4207, and 4214 that, among other things, proscribe contracts in excess of three years, require that consumers be afforded certain termination rights, and mandate that health spa contracts with consumers, by implication, be in writing, and

---

**9.** See Complaint, Counts I–III.

**10.** See Stephenson v. Capano Dev., Inc., 462 A.2d 1069 (Del.1983).

contain certain statutorily specified terms.[11]

Third, the State claims that Pettinaro violated § 2532 of the Deceptive Trade Practices Act because its advertisement and sale of health spa contracts that were illegal under the Health Spa Regulation laws led consumers to believe that the contracts complied with the law.[12] Fearing that even a belt and suspenders might not hold up the State's claims,[13] the Attorney General also applied duct tape, alleging that this same conduct violated § 2513(a) of the Consumer Fraud Act because Pettinaro was advertising and selling illegal health spa contracts.[14]

As to all of the alleged violations of these statutes, the State avers that Pettinaro acted willfully. As relief for the violations, the State seeks:

· Injunctive relief prohibiting Pettinaro from violating the Consumer Fraud Act, the Deceptive Trade Practices Act, and the Health Spa Regulation in the future;

· Restitution for residents and other consumers harmed by the violations;

· Civil penalties for the violations, in accordance with 6 Del. C. §§ 2513, 2532, and 2581;

· Payment of any back registration fees Pettinaro owes the Health Spa Guarantee Fund for the period during which it operated a health spa at the Clubhouse;

· An award of attorneys' fees and costs and of pre-and post-judgment interest on any monetary award.

Notably, the Complaint does not seek an affirmative injunction requiring Pettinaro to repurchase the Clubhouse in order to specifically live up to any promises it made to the residents that they would have access.

## II. *Pettinaro's Motion To Dismiss*

Pettinaro has moved to dismiss the State's complaint for failure to state a claim upon which relief can be granted under Chancery Court Rule 12(b)(6), and has submitted several exhibits in conjunction with that motion.

▮▮▮ A motion to dismiss will be granted where, under any set of facts that could be asserted to support the claim, the plaintiff would not be entitled to relief.[15] The necessary analysis assumes the truth of the well-pled facts contained in the plaintiff's complaint, and requires that all reasonable inferences arising from pled facts be drawn in favor of the plaintiff. At the same time, however, the court does not give weight to conclusory allegations unsupported by any underlying allegation of fact.[16]

▮▮▮ A Rule 12(b)(6) motion is an attack on the legal sufficiency of the complaint and is designed to test whether, assuming the plaintiff's pled facts are true, the plaintiff possesses any legally viable claim. The motion therefore is not one that presupposes that the plaintiff has had access to all the information it will eventually need to prove its claim. For that reason, the court's ability to consider docu-

---

11. *See* Complaint, Counts IV–VI.

12. Complaint, Count VIII.

13. It is not at all clear what is achieved by this technique of premising violations of more general consumer affairs statutes on violations of the consumer statute that specifically addresses the commercial conduct at issue.

14. Complaint, Count VII.

15. *In re Tri–Star Pictures, Inc., Litigation,* 634 A.2d 319, 326 (Del.1993).

16. *Id.*

ments beyond the complaint is quite limited.[17] Under Rule 12(b), consideration of documents outside of the complaint will usually cause a motion to dismiss to be converted to a motion for summary judgment under Rule 56.[18]

■ Here, Pettinaro has submitted a large number of documents that are neither incorporated in nor integral to the Attorney General's complaint. In particular, Pettinaro has submitted examples of contracts with Condominium purchasers, claiming that provisions contained in those contracts disprove the notion that purchasers reasonably believed that the Clubhouse was part of the common area of the Condominium complex. Similarly, Pettinaro relies upon integration clauses in its contracts, of which the examples submitted are supposedly representative, to buttress an argument that the State's claims are barred because they seek recovery on behalf of residents who, in contracting with Pettinaro, allegedly disclaimed any reliance upon representations not contained in their sales or rental agreements. Rather than provide all resident contracts, Pettinaro submitted a chart summarizing provisions included in groups of contracts. Pettinaro purports, through representations

of fact, to have the court rely upon its summary of what the various contracts say. These documents are not, in my view, cognizable on a Rule 12 motion. Although the Attorney General was obviously well-positioned to get many of these same documents from residents during its pre-suit investigation, that reality does not disentitle her to discovery or require her, at this stage, to defeat what in actuality is *a fact-laden motion for summary judgment*, based on selected snippets of information, simply because Pettinaro has cloaked its motion in the guise of an attack on the facial viability of the pleading. For that reason, Pettinaro's arguments that the State's claims are factually disproved and, in some cases, even barred by the terms of individual residents' contracts,[19] are unavailing as bases for dismissal under Rule 12(b)(6) and consider them no further at this stage of the case.

■ A good deal of this opinion is devoted to consideration of the timeliness of the State's claims. On a motion to dismiss, the timeliness of claims can be assessed on the basis of facts pled in the complaint, and dismissal is proper when the pled facts demonstrate that the claims are untimely.[20] A court considering timeli-

---

17. See *In re Santa Fe Pac. Corp. Shareholder Litig.*, 669 A.2d 59, 68–70 (Del.1995).

18. See *Id.*

19. This particular argument also raises a serious policy issue. Specific non-reliance clauses have been (rightly, in my view) held to bar fraud claims premised on reliance on representations extrinsic to commercial contracts. See, e.g., *Progressive International Corp. v. E.I. DuPont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del.Ch. July 9, 2002) ("To allow [the buyer] to assert, under the rubric of fraud, claims that are explicitly precluded by contract, would defeat the reasonable commercial expectations of the contracting parties and eviscerate the utility of written contractual agreements." (quoting *Great Lakes Chem.*

*Corp. v. Pharmacia Corp.*, 788 A.2d 544, 556 (Del.Ch.2001))). Whether such clauses would preclude an action under a specific statute raises different considerations, including the question of legislative intent. See *Kronenberg v. Katz*, 872 A.2d 568, 588–96 and n. 46 (Del.Ch.2004) (discussing federal case law holding that a non-reliance clause does not act as a per se bar to an action under § 12(2) of the federal Securities Act, even if the securities claims depend on a showing that the Plaintiff reasonably relied on a statement extrinsic to the contract), *aff'd* 867 A.2d 902 (Del.2005).

20. See, e.g., *In re Dean Witter Partnership Litigation*, 1998 WL 442456, at *3 (Del.Ch. July 17, 1998); *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del.Ch.1993).

ness as a basis for a motion to dismiss must draw the same plaintiff-friendly inferences required in a 12(b)(6) analysis. This plaintiff-friendly stance does not govern assertion of tolling exceptions to the operation of a statute of limitations (or the running of the analogous period for purposes of a laches analysis), however. A plaintiff asserting a tolling exception must plead facts supporting the applicability of that exception.[21]

The spirited briefing between Pettinaro and the State raised a plethora of issues, several of which were only cursorily briefed.[22] In this opinion, I will concentrate on those arguments that are proper for consideration at this stage and which were sufficiently treated by the parties in their papers.

For the sake of clarity, it is useful to capture those arguments summarily before addressing them:

· Pettinaro argues that the State's claims under the Consumer Fraud Act and the Deceptive Trade Practices Act are barred by the five-year statute of limitations that applies to actions by the Attorney General under that Act. Because the Attorney General brought this suit on March 8, 2004, Pettinaro asserts that all claims for conduct alleged to have occurred before March 8, 1999 are now time-barred. The State responds that any statute of limitation

governing its claims under those Acts was tolled until consumer complaints brought Pettinaro's violations to the attention of the Attorney General;

· Pettinaro also argues that the State's claims under Delaware's Health Spa Regulation laws are time-barred. While conceding that those laws do not incorporate a specific statute of limitations running against the State, and that the State is generally not subject to statutes of limitation unless the General Assembly expressly states that to be the case, Pettinaro nevertheless contends that the State, in seeking to enforce the Health Spa Regulation, is acting in a purely or mostly proprietary capacity (akin to a private actor) and, consequently, that the doctrine of sovereign immunity does not operate to exempt this action—as it would an action brought by the State in its sovereign capacity—from the three-year limitation period under 10 *Del. C.* § 8106 that generally applies to actions arising under a statute. As all of these claims arise out of conduct that ceased, at the latest, in early 1999, Pettinaro contends that they are clearly stale;

· Finally, Pettinaro argues that the complaint fails to state a valid claim for injunctive relief. Pettinaro contends that the Attorney General, having waited until after ownership of the Club-

---

**21.** *See In re Dean Witter,* 1998 WL 442456, at *6 ("[T]he party asserting that tolling applies ... bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.").

**22.** As an example of a cursorily briefed issue (which I will address only summarily), Pettinaro asks me to revisit an earlier decision of this court holding that the Attorney General is not bound to meet the standards of Rule 9(b) in bringing claims under the Consumer Fraud Act or the Deceptive Trade Practices Act. *State ex rel. Brady v. Publishers Clearing*

*House,* 787 A.2d 111 (Del.Ch.2001). I decline to upset the conclusion reached in *Publishers Clearing House.* Although reasonable minds might quibble with the outcome of that decision, that is the case with most decisions addressing interesting legal questions. Put simply, I find no persuasive reason to depart from the well-reasoned and carefully considered decision issued by this court in *Publishers Clearing House.* Pettinaro is, of course, free to seek a different ruling from our Supreme Court or to seek a clarifying statutory pronouncement from the General Assembly.

house was transferred to a third party to bring suit, cannot now seek an injunction requiring it to repurchase the Clubhouse and to reopen the health club facilities for use by Condominium residents. The Attorney General counters that she is only seeking an injunction barring Pettinaro from violating the relevant statutes in the future (albeit without citing even one fact suggesting the likelihood of a recurring breach or the necessity for such a superfluous injunction). Pettinaro further argues that, as a result of the Attorney General's failure to plead a claim for injunctive relief, her claim under the Deceptive Trade Practices Act must be dismissed because that Act has been interpreted as only applying to situations when a viable basis for seeking injunctive relief exists.

I will now address these arguments more fully, in the same order.

### III. Are The Attorney General's Claims Under The Consumer Fraud Act And The Deceptive Trade Practices Act Timely?

█ As a general matter, the doctrine of sovereign immunity permits the State to bring actions in its sovereign capacity without being subject to statutes of limitation that govern private parties, unless the Delaware General Assembly has specifically subjected the State to a limitation period.[23] On July 17, 1998, the General Assembly enacted 6 *Del. C.* § 2506 to provide a five-year limitation period for actions brought by the Attorney General under various consumer protection statutes, including the Consumer Fraud Act and the Deceptive Trade Practices Act. Section 2506 therefore permits the Attorney General to assert claims beyond the three-year limitation period that applies to claims by individual consumers under those Acts.[24]

█ The State argues, as a baseline issue, that § 2506 does not bar actions in equity, citing language from that statute stating "no action *at law* by the Attorney General ... shall be initiated after the expiration of 5 years from the time the cause of action accrued."[25] By implication, the State argues that a claim for injunctive relief in equity may be brought after that time. That argument does not aid the State. For starters, it is merely academic here. Later in this decision, I conclude that the State has failed to plead any equitable claim. And for the reasons that follow, even if I am wrong on that score, the State's argument is, on its merits, untenable.

█ Initially, I note the general rule that a court of equity is not strictly barred by any legal statute of limitations— instead, statutes of limitation that apply to actions at law are deemed to establish a time period beyond which delay in bringing a claim is presumptively unreasonable for purposes of applying laches.[26] Conse-

23. See, e.g., Mayor and Council of Wilmington v. Dukes, 157 A.2d 789, 794 (Del.1960) (recognizing the general rule "unless the statute expressly provides to the contrary, that statutes of limitations do not apply to a state when suing in its sovereign capacity," but noting that necessary implication of statutory language, as well as express provision of a statute, may subject state action to a statutory limitation period).

24. See, e.g., Pender v. DaimlerChrysler Corp., 2004 WL 2191030, at *2 (Del.Super. July 30, 2004) (dismissing claims brought by private parties under the Consumer Fraud Act and Deceptive Trade Practices Act for non-compliance with the three-year limitations period applicable to such claims under 10 Del. C. § 8106).

25. Emphasis added.

26. See, e.g., Acierno v. Goldstein, 2004 WL 1488673, at *2 (Del.Ch. June 25, 2004).

quently, when claims are barred by a controlling statute of limitations, a court of equity need not engage in a traditional laches analysis.[27] Most important, it is understood that the bar of laches will typically arise earlier than the end of the limitations period when a plaintiff seeks a judicial order involving compulsions such as an injunction or an order of specific performance. Remedies of this kind will only issue if the plaintiff acts with dispatch, and are normally foreclosed to a plaintiff who sits on its hands until near the end of the analogous limitations period.[28] This well-understood distinction makes it implausible that the words "at law" in § 2506 were intended to allow the State to, perversely, press any requests for equitable remedies, however stale, while being required to assert requests for other relief, such as civil fines, within five years.

In this vein, the legislative intent of the Acts to which § 2506 applies does not comport with the inapplicability of the five-year limitation period to actions seeking equitable relief such as an injunction. The Consumer Fraud Act specifically expresses the public interest in prompt enforcement, stating that "[i]t is the intent of the General Assembly that [practices that violate the Act] *be swiftly stopped ....*"[29] The legislative intent of the Deceptive Trade Practices Act has also been construed as demanding immediate enforcement.[30] Given the legislative emphasis on prompt assertion of claims under those Acts, coupled with the requirement of prompt presentment ordinarily necessary to avoid a finding of laches, it would be bizarre to interpret § 2506 as permitting the State to bring claims for injunctive relief after the capacious five-year limitation provided under that statute has run.

A far more sensible interpretation flows out of the synopsis of the bill that enacted § 2506, which states a broader intent to "create[ ] a five (5) year limitation period for actions brought *under this chapter* ...."[31] The broad sweep of that language, subsuming actions at law and in equity, faithfully comports with the legislative intent underlying the consumer statutes that § 2506 was enacted to govern. Accordingly, the term "at law" as it is used in § 2506 seems to be best read as indicating that the statute of limitations applies whenever the Attorney General brings an action under any of the consumer protection statutes to which § 2506 applies. By definition, actions brought under statutes are

**27.** *See Kerns v. Dukes,* 2004 WL 766529, at *3 (Del.Ch. Apr.2, 2004).

**28.** *See CertainTeed Corp. v. Celotex Corp.,* 2005 WL 217032, at *6 (Del.Ch. Jan.24, 2005) (noting that a request for an injunction or other forms of equitable relief may invoke strict requirements for prompt action by the plaintiff that may justify an application of the laches doctrine, even when an analogous statute of limitations provides a longer time period during which a claim could be asserted); *see also Carey v. Landy,* 1989 WL 44051, at *3 (Del.Ch. Apr.27, 1989) ("Injunctive relief will be denied where a plaintiff inexcusably delays for several years before taking action."); *Wright v. Scotton,* 121 A. 69, 72 (Del.1923) ("The rule is well established, independent of

any statute of limitations, that if a party is guilty of laches or unreasonable delay in applying for an injunction, he thereby forfeits his claim to that special form of remedy.").

**29.** 6 *Del. C.* § 2512 (emphasis added).

**30.** *See Dionisi v. DeCampli,* 1995 WL 398536, at *13 (Del.Ch. June 28, 1995) (barring a request for an injunction under the Deceptive Trade Practices Act on laches grounds, noting that "[t]he Act is designed to encourage immediate or at least timely enforcement of its provisions to halt unfair or deceptive trade practices between [parties].").

**31.** H.B. 258, 139th Gen. Assem., 2d Sess. (Del.1997) (emphasis added).

actions "at law." [32]

For the foregoing reasons, I reject the Attorney General's argument that § 2506 does not limit its claim for an injunction. Having established that the State's claims under the Consumer Fraud Act and the Deceptive Trade Practices Act are generally subject to the five-year statute of limitations set forth in § 2506, I address two arguments concerning the application of that statute in light of the specific facts of this case. The parties dispute, first, the applicability of § 2506 to claims that accrued before the effective date of that section and, second, the applicability of tolling principles to activities that the State characterizes as "inherently unknowable."

### A. Does 6 Del. C. § 2506 Apply To Causes Of Action That Accrued Before Its Enactment?

The parties dispute the effect of 6 Del. C. § 2506 in limiting actions brought by the State under the Consumer Fraud Act and the Deceptive Trade Practices Act for causes of action that accrued before § 2506 was enacted. The concept of sov-

ereign immunity underlies that dispute. Here, § 2506 explicitly limits actions brought by the Attorney General, stating that: "no action at law by the Attorney General brought under this chapter shall be initiated after the expiration of 5 years from the time the cause of action accrued." But because § 2506 became effective on July 17, 1998, and the State alleges misconduct by Pettinaro dating back to 1989, the parties dispute the applicability of § 2506 to claims that accrued before July 17, 1998. Arguably, if the State acts in its sovereign capacity in bringing claims that accrued before July 17, 1998, and if § 2506 does not operate retroactively to limit the State in bringing this older class of preexisting claims, then the doctrine of sovereign immunity applies, and those claims are not subject to any statute of limitations.

Pettinaro argues, based on its interpretation of the General Assembly's intent in enacting § 2506 and on case law holding that statutes are presumed retroactive if remedial in nature,[33] that § 2506 applies retroactively to bar claims for acts that

**32.** The question of whether the State may, through the doctrine of laches, be barred in seeking injunctive relief sooner than five years after its claims accrued need not be addressed here. In view of the statutory intent behind § 2506 and the General Assembly's desire for swift enforcement of the Consumer Fraud Act and the Deceptive Trade Practices Act, there is a colorable argument that a laches defense could be asserted against the State. The use of laches against the State, while raising unique considerations, is not unprecedented. See Berchock v. Council on Real Estate Appraisers, 2001 WL 541026 (Del.Super.Apr.26, 2001) (rejecting a laches argument, not because laches does not operate against the State, but because it was not preserved for appeal); State v. Moffitt, 2000 WL 973120 (Del.Super. May 3, 2000) (overturning a decision by the Adult Entertainment Commission against the Attorney General on the basis of laches, not because the state is exempt from laches, but because no evidence of prej-

udice was found). On the other hand, there is also precedent holding that the State, when acting in a sovereign capacity to enforce a statute, is not ordinarily subject to a laches defense. See State of Del. Dept. of Services for Children, Youth and Their Families v. Cedars Academy, 1989 WL 110531 (Del.Ch. Sept.22, 1989). In this context, the question would become whether the General Assembly, having specifically subjected the State to a five-year statute of limitations and having stated its expectation that violations of the relevant consumer affairs statutes be rapidly stopped, contemplated that the State be subject to a laches defense for bringing injunctive claims at a torpid pace. I need not answer that question now.

**33.** Hubbard v. Hibbard Brown & Co., 633 A.2d 345, 354 (Del.1993); Jennings v. DeBussy, 707 A.2d 44, 47 (Del.Fam.Ct.1997).

occurred before the statute's effective date, even though the statutory language is silent on the issue of retroactive effect. The State responds that statutes are generally presumed not to apply retroactively absent clear legislative intent to the contrary,[34] and here, the language of § 2506 itself does not address prospective or retrospective application.

The problem with the State's approach is that it seeks to apply a very general rule about retroactivity in a context to which is does not logically apply. The presumption against retroactivity ensures that, absent a clear expression of intent by the General Assembly, citizens are not, for example, told in 2005 that what they did in 2004 is now a violation of civil law, even though it was perfectly legal at the time, or alternatively, that injured parties do not find that claims for injuries they sustained in 2004, which at the time were subject to a three-year statute of limitations, are suddenly time-barred in 2005 by a newly-enacted one-year statute of limitations. The presumption in those common contexts operates as a bulwark against unfairness. Even when that danger of unfairness exists, however, the statute might be found to apply retroactively if the court concludes that it is remedial. A statute is "remedial" when "it relates to practice, procedure or remedies and does not affect substantive or vested rights."[35] Here, it is easy to conceive of § 2506 as both remedial in nature and as not posing any risk of unfairness by retrospective application, so long as the new period of limitations that it imposes is not implemented in a manner that unfairly deprives

persons with pre-existing claims of the opportunity to file within the new limitations period. This distinction is recognized in venerable authority from the highest court of our nation.

In *Sohn v. Waterson*,[36] the U.S. Supreme Court addressed the application of a newly enacted statute of limitations to pre-existing causes of action. In crafting its decision, the Court was mindful of the need to not deprive parties with pre-existing claims of a fair opportunity to press those claims. In other words, the Supreme Court did not believe that the new limitations period should be interpreted as applying retroactively to bar immediately any claims that pre-dated the enactment of the limitations period.

Therefore, if the new statute of limitations was, for example, three years, and the plaintiff's claims predated the enactment of the statute by three years, the Supreme Court's application of the new statute still afforded the plaintiff a fair opportunity to sue. How? By holding that, although "[a] statute of limitations may undoubtedly have effects upon actions which have already accrued as well as upon actions which accrued after its passage," that effect must allow parties the full statutory time to bring their actions after the statute imposing a limitation period was passed, even when their claims accrued before the date of passage.[37] Calculation of a statute of limitations in such situations "must commence when the cause of action is first subjected to the operation of the statute,"[38] that is, on the date of its enactment.

---

34. *Hubbard*, 633 A.2d at 354.

35. *Id.* (quoting 2 Norman J. Singer, *Sutherland Stat. Const.* § 41.09, at 399 (5th ed.1993)).

36. 17 Wall. 596, 84 U.S. 596, 21 L.Ed. 737 (1873).

37. *Id.* at 599–600.

38. *Id.* at 600.

Although *Sohn* was decided in 1873, contemporary federal court decisions have noted that "[t]he century-old *Sohn* rule still enjoys great viability."[39] And for good reason, as it is a sensible and fair way to implement a legislature's intentions as to the effect of a new statute of limitations on pending cases.

*Sohn* has been construed only once by a Delaware court. In *Friedmann v. McGowan*,[40] the Superior Court considered the application of a newly enacted one-year limitation period to a cause of action that had previously been governed by a three-year limitation period, and had accrued two years before suit was filed. The *Friedmann* court, distinguishing *Sohn* on its facts, declined to apply the newly enacted one-year statute of limitations retroactively, as doing so would unjustly shorten the limitation period that governed the cause of action when it accrued.[41] The *Friedmann* court went on to note that its conclusion was actually supported by language in *Sohn* stipulating that a newly enacted statute should not be construed to act as an immediate and absolute bar to an action that accrued in the past.[42]

The *Sohn* rule provides a sensible resolution to this issue and—most importantly—reaches the outcome most consistent with the inferable intent of the General

Assembly in enacting § 2506. The public policy rationale underlying the enactment of statutes of limitation is that "it is unjust to fail to put an adversary on notice to defend within a specified period of time, and that the right to be free of stale claims in time comes to prevail over the right to prosecute them."[43] Although § 2506 is silent concerning retrospective application, it can reasonably be inferred that the limitation period was enacted to serve this policy purpose, especially given the General Assembly's desire for prompt enforcement of the Consumer Fraud Act and the Deceptive Trade Practices Act.[44] In enacting § 2506, the General Assembly demonstrated its desire to impose a limitation on the State when none had existed previously.

In light of the General Assembly's unmistakable intent to limit the Attorney General in bringing stale actions, I am persuaded that an illogically inconsistent intent—that claims arising after July 17, 1998 would be time-barred as stale after five years, while claims that arose before July 17, 1998, and are thus even more stale, would linger indefinitely—cannot reasonably be inferred.[45] Rather, retroactive application of § 2506—in the tempered manner of *Sohn*—to limit assertion

**39.** *Reuther v. Trustees of the Trucking Employees of Passaic & Bergen County Welfare Fund,* 575 F.2d 1074, 1078 n. 4 (3rd Cir.1978); *see also Rogers v. U.S.,* 180 F.3d 349, 354 and n. 11 (1st Cir.1999) (citing *Sohn* for its proposition that a newly-enacted statute of limitations should be applied to the enforcement of a past judgment beginning on the date the new limitation period was enacted); *Union Mfg. Co., Inc. v. U.S. Intern. Trade Com'n,* 781 F.2d 186, 189 (Fed.Cir.1985) (noting that "the *Sohn* rule has often been followed"); *U.S. v. Lindsay,* 202 F.2d 239, 240 (1st Cir.1953) (referring to *Sohn* as "the leading case" on the application of newly-enacted statutes of limitation to pre-existing causes of action); *Superior Engraving Co. v. N.L.R.B.,* 183 F.2d 783, 789 (7th Cir.1950) (describing the *Sohn* rule as a "well-settled rule").

**40.** 42 A. 723 (Del.Super.1898).

**41.** *Id.* at 725.

**42.** *Id.*

**43.** 51 Am.Jur.2d *Limitation of Actions* § 13 at 460 (2000).

**44.** *See* authorities cited *supra* notes 29–30.

**45.** 54 C.J.S. *Limitations of Actions* § 6 at 27 (1987) ("Statutes of limitation should not be construed so as to reach an absurd result.").

of claims for consumer fraud or deceptive trade practices by the Attorney General more than five years after accrual is necessary to serve the inferable intent of the General Assembly in enacting that statute.

The Attorney General alleges violations of the Consumer Fraud Act and the Deceptive Trade Practices Act dating back to 1989. Applying *Sohn,* the limitation period set forth in § 2506 applies to causes of action that accrued before its enactment, and calculation of that period · commences when the causes of action were first subjected to the statute, here, on July 17, 1998, the date of its enactment. Consequently, all of the Attorney General's claims for conduct by Pettinaro that occurred before the enactment of § 2506 became time-barred five years after its enactment, on July 17, 2003, and must be dismissed.

B. *Was The Statute Of Limitations Governing The State's Claims Under The Consumer Fraud Act And The Deceptive Trade Practices Act Tolled?*

 Statutes of limitation are calculated beginning from the date of accrual of a cause of action, "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[46] In certain limited circumstances, however, the running of a statute of limitations may be tolled until some time after the cause of action accrued. Under the common law of our state, tolling is permitted, for example, when an injury is inherently unknowable to the plaintiff,[47] or when a wrongful act is fraudulently concealed by the wrongdoer.[48] By its terms, 6 *Del. C.* § 2506 permits the State to rely on recognized common law tolling exceptions.[49] Here, the State argues that Pettinaro's violations were inherently unknowable, or alternatively, were fraudulently concealed, until the Attorney General's office was placed on inquiry notice of those violations in March 2001 by consumer complaints concerning Pettinaro's marketing and advertising practices in the sale of Condominium units.

 For a limitations period to be tolled under the doctrine of inherently unknowable injury, "there must have been no observable or objective factors to put a party on notice of injury."[50] The obvious closure of the Clubhouse in 1999 constituted clear notice that would have caused a reasonable person to investigate the status of the Clubhouse. For this reason, Condominium residents were on inquiry notice of Pettinaro's alleged misconduct in 1999, and the traditional application of the doctrine of inherently unknowable injury is unwarranted here.

 Fraudulent concealment may be found to exist where a defendant knowingly acted to prevent a plaintiff from learning facts or otherwise made misrepresentations intended to "put the plaintiff off the trail of inquiry."[51] Fraudulent concealment tolls a statute of limitation until a plaintiff discovers his rights or could have discovered them by the exercise of reasonable diligence.[52] Here, Pettinaro's closure

46. *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004).

47. *See Layton v. Allen,* 246 A.2d 794, 799 (Del.1968).

48. *See Isaacson, Stolper & Co. v. Artisan's Savings Bank,* 330 A.2d 130, 132 (Del.1974).

49. 6 *Del. C.* § 2506 states in part that "... any applicable tolling or savings provisions created under the common law shall apply."

50. *In re Dean Witter,* 1998 WL 442456, at *5.

51. *Halpern v. Barran,* 313 A.2d 139, 143 (Del. Ch.1973).

52. *Shockley v. Dyer,* 456 A.2d 798, 799 (Del. 1983).

of the Clubhouse in late 1998 or early 1999 was so blatantly obvious that no affirmative act of concealment could have prevented a reasonably diligent Condominium resident from discovering his rights at that time. Moreover, the State alleges no affirmative acts of concealment. For these reasons, the doctrine of fraudulent concealment does not aid the state here.

■ The Attorney General's theory, that a state agency is not on inquiry notice of statutory violations because those violations are inherently unknowable to the agency until it receives actual notice in the form of complaints from aggrieved citizens, is intuitively implausible, as an analogy to criminal law makes clear.

Under our criminal law, statutes of limitation "start to run on the day after the offense is committed."[53] And a key exception to that general rule further illustrates the problem with the State's argument in this case. That exception expressly permits extensions of the statute of limitations for prosecution of certain concealed or undiscoverable crimes. 11 *Del. C.* § 205(c) states that:

> If the period [for bringing actions under this section] has expired, a prosecution for any offense in which the accused's acts include or constitute forgery, fraud, breach of fiduciary duty or actively concealed theft or misapplication of property . . . may be commenced within 2 years after discovery of the offense has been made or should have been made in the exercise of ordinary diligence *by an*

*aggrieved party* . . . . In no case shall this provision extend the period of limitation otherwise applicable by more than an additional 3 years beyond the period specified [in this section].[54]

Although § 205(c) permits extension of a statute of limitations in circumstances where an accused has taken steps to conceal his wrongful acts, diligence on the part of the aggrieved party in discovering the offense is an absolute requirement for the applicability of that extension.[55] Even more important, the statute of limitations begins to run not when the State is informed by the aggrieved party of the crime, but on the date when the aggrieved party could have discovered its injury. That is, the State always runs the risk, as in other criminal settings, that its ability to prosecute will expire unless a victim reports the crime with sufficient celerity.[56]

Given the public policy underlying statutes of limitation in general—to compel timely pursuit of claims and to avoid the adjudication of stale claims—and these apt criminal law analogies, in particular—I cannot accept the State's strange argument that the § 2506 limitation period did not start to run until the Attorney General received complaints from consumers. To do so would be to condone torpor on the part of consumers, as well as the State itself. And the affected consumers undoubtedly acted with torpor here. Pettinaro shut down the Clubhouse, at the latest, in early 1999. From that time, the Clubhouse was inaccessible to Condomini-

---

53. 11 *Del. C.* § 205(f).

54. Emphasis added.

55. Even then, the extension of the limitation period under § 205(c) is limited to three years beyond the normal period.

56. There is another specific, statutory criminal law exception that proves the general rule that statutes of limitation run against the state

from the time of the crime, not reporting. In the special context of certain sex crimes against minors, the State is given two years to commence the prosecution from the date the alleged victim discloses the incident to the Delaware Division of Child Protective services or to another police agency. 11 *Del. C.* § 205(e).

um purchasers, and yet the first consumer complaint reached the Attorney General more than two years later. The same policy concerns that require consumers to bring direct claims for consumer fraud and deceptive trade practices in a timely fashion also require that consumers timely inform state consumer protection agencies of such practices. Here, for example, the State seeks restitution for residents who have, by their inaction, forfeited their own right to seek that relief.[57] In so concluding, I realize, of course, that as a practical matter, state agencies may be reliant on citizen complaints to trigger their investigations as to even blatantly unlawful conduct. But that reality does not allow the State the luxury to recline in a leather chair, believing that the statute of limitations will only run once some aggrieved citizen gets around to making a complaint.[58]

To accept the State's tolling argument would be to obviate the plain intent of § 2506. There is no reason to believe that the General Assembly adopted § 2506 with the implicit notion that the State would have access to anything other than traditionally recognized tolling exceptions. It would also be strange because the General Assembly intended that violations of the Consumer Fraud Act and the Deceptive Trade Practices Act be stopped with rapidity.[59] The unprecedented exception the State seeks is essentially a jurisprudential validation of a specialized form of inertia, whereby compliance with a statute of limitations is excused on the notion that a government investigation and enforcement agency at rest stays at rest until set in motion. The judicial recognition of this inertial exception would have no grounding in actual legislation and seems an unwise common law invention.

Here, without my acceptance of the State's new proposed tolling exception, the State has no basis to argue that the statute of limitations was tolled. The residents of Towne Estates were undoubtedly on notice that would have caused a reasonable person to investigate the status of the Clubhouse when the Clubhouse was closed in 1999, two years before the Attorney General received its first complaint, and five years before this action was filed. Because the closure was both obvious and unconcealed, common law tolling exceptions are unwarranted here. Given this analysis, all of the State's claims under the Deceptive Trade Practices Act are time-barred as those claims depend solely on conduct pre-dating March 8, 1999, five years before this action was filed. As to the State's Consumer Fraud Act claims, all are time-barred except its allegations that leaving up the sign from March 1999 until March 2000 violated the Act. The vast bulk

---

57. Actions by individual consumers under the Consumer Fraud Act and the Deceptive Trade Practices Act are governed by a three-year statute of limitations under 10 Del. C. § 8106. *See Pender,* 2004 WL 2191030, at *2; *see also Dionisi,* 1995 WL 398536, at *13 (barring an individual's claims for injunctive relief under the Deceptive Trade Practices Act on the basis of laches). Because conduct by Pettinaro alleged to have violated the Consumer Fraud Act ceased in March 2000, individual consumers would have been barred from pursuing claims under that Act in March 2003. Likewise, because conduct alleged to have violated the Deceptive Trade Practices Act ceased in early 1999, consumers could not have pursued claims under that Act after early 2002.

58. The State cites *Attorney General of Maryland v. Dickson,* 717 F.Supp. 1090 (D.Md. 1989) as authority for its position on the issue of tolling. That case holds that a statute of limitations is tolled against a government agency until that agency first receives information concerning statutory violations. For reasons I have explained, that is not a rule consistent with Delaware law.

59. *See* authorities cited *supra* notes 29–30.

of its consumer fraud claims must be dismissed.

### IV. *Are The Attorney General's Claims Under The Health Spa Regulation Time–Barred?*

Pettinaro also argues that the Attorney General's claims under the Health Spa Regulation are time-barred. This argument raises statutorily-specific concerns. Section 4219 of the Health Spa Regulation contains an express indication of the General Assembly's intention that individuals may enforce the Regulation by way of a private right of action. Therefore, § 4219 imposes a three-year statute of limitation on private parties bringing such a cause of action, by virtue of 10 *Del. C.* § 8106, which applies to causes of action arising under a statute. But § 8106 does not refer to statutory enforcement actions asserted by the State itself, and the Health Spa Regulation is silent on the subject of when the State may bring claims under its provisions. By implication, therefore, the three-year statute set forth in § 8106 does not apply to the State. Further, because no provision of the Health Spa Regulation explicitly creates a limitation period applicable to State enforcement, the general rule exempting state action from statutes of limitation on the basis of sovereign immunity applies.

Pettinaro, however, argues that the general rule does not apply in instances when the State is acting in a proprietary rather than sovereign capacity. It contends that statutes of limitation will apply to bar state action when a court concludes that an action is designed to advance the State's proprietary interests in seeking monetary awards or obtaining relief for discrete sets of affected residents, rather than operating as a sovereign advancing the broader public interest, as reflected in a statute of general applicability.

 A close reading of the relevant Delaware precedent reveals no clear bright line test for distinguishing between proprietary and sovereign state action. Unlike Pettinaro, I find no basis to conclude that the State acts in a proprietary capacity—rather than sovereign capacity—merely because a particular enforcement action might tend to benefit a discrete set of citizens to a greater extent than others.[60] By its express terms, the Health Spa Regulation was passed to advance the public interest:

> The purpose of this chapter is to safeguard the public interest against fraud, deceit and financial hardship, and to foster and encourage competition, fair dealing and prosperity in the field of health spa services by prohibiting false and misleading advertising and dishonest, deceptive and unscrupulous practices by which the public has been injured in connection with contracts for health spa services. This chapter shall be liberally construed and applied to promote its underlying purposes and policies.[61]

**60.** Pettinaro relies, without justification, on *State Board of Trustees of Delaware State Hospital at Farnhurst v. Boyer*, 159 A.2d 793, 794 (Del.Super.1960). *Boyer* holds that the generally recognized rule—that statutes of limitations do not apply to a state acting in its sovereign capacity—*necessarily* applies "if the action is for the sole benefit of the state"— that is, when the action is solely brought to advance a sovereign interest. *Boyer* does not *require* that state action be solely for the benefit of the state to be exempt from statutes of limitation under the general rule—it holds that, when state action "is for the sole benefit of the state," it is, by definition, sovereign in nature, and therefore *exempt from statutes of limitation*. The decision is silent as to state action for the benefit of the state or the people at large that is also for the benefit of a limited class of individuals.

**61.** 6 *Del. C.* § 4201.

Given this express purpose and the express legislative intention that the Health Spa Regulation be liberally construed, I cannot accept Pettinaro's characterization of this action as merely proprietary. To accept that reasoning would mean that any time the State acted to protect the rights of its citizens under a statute (such as a statute prohibiting invidious discrimination), then the State would be acting primarily as a proprietor. Most such enforcement actions are specific in nature and tend to afford a greater benefit to particular citizens than to the public generally. Certainly, that is true here.

But the overall utility of a statute such as the Health Spa Regulation depends importantly on the State's willingness to prosecute particular violations. By establishing a credible enforcement regime, the State thereby maximizes the probability that the statute's terms will be generally honored for the benefit of the larger public it was designed to protect. In this case, for example, the State alleges that Pettinaro operated a health spa for over a decade without complying in any manner with the Health Spa Regulation. If that is so—and I must accept that it is so on this motion—then the State has an obvious sovereign interest in enforcement that extends well beyond the residents at the Towne Estates Condominiums. From its perspective, the State's tolerance of a health spa operator who fails to register, pay its required fees, or otherwise honor the Health Spa Regulation, would encourage others to flout the law—thereby undermining the protections the Regulation was intended to provide for the large number of Delawareans who work out at health spas. In other words, although the State may benefit itself in recovering back dues for the Health Spa Guaranty Fund,[62] and potentially benefit specific residents of the Condominiums if it obtains restitution for them under the Regulation, those narrower effects do not obscure the broader public interest served by enforcement actions like these.

Of course, a credible argument can be made that it would be better public policy for the State to subject itself to an express statute of limitations in enforcing the Health Spa Regulation. But that is precisely the sort of policy argument that should be decided by the General Assembly. Having expressly asked that the Health Spa Regulation be liberally construed to advance the statutory purposes of "safeguard[ing] the public interest[s]" specifically identified in § 4201, and having failed to subject the State to any express statute of limitation, the General Assembly's silence reflects, in view of Delaware's long-standing approach to these questions, a decision not to subject the State to any statute of limitations. For these reasons, Pettinaro's motion to dismiss the counts of the complaint brought under the Health Spa Regulation is denied.

## V. Does The Attorney General Have A Valid Basis For Seeking Injunctive Relief?

 Pettinaro argues that the Attorney General's request for injunctive relief is moot. Because any violations of the

---

62. Pettinaro contends that the State seeks to benefit itself in a proprietary capacity by seeking back fees owed to the Health Spa Guaranty Fund. Pettinaro notes that, under 6 *Del. C.* § 4204, any excess over $350,000 in the Fund at the end of a given fiscal year will be withdrawn and deposited into the State's General Fund. This argument is not convincing. Any pecuniary benefit flowing to the State as a consequence of enforcing the payment of fees into the Health Spa Guaranty Fund is indirect and entirely contingent upon the balance in the Fund at any given time. Moreover, it is quite possible that the State will never receive any of the fees paid into the Fund. And of course, if no one pays, then the Fund cannot serve the public purposes for which it was established.

statutes she relies upon ceased no later than March 2000, there is no present conduct identified in the complaint to which injunctive relief can be addressed. Also, because Pettinaro transferred the Clubhouse to the Oblates of St. Francis before this action was filed, it would be impractical and inequitable (particularly given the torpor in filing this case and the effect it would have on an apparently innocent third party) for the Attorney General to ask for Pettinaro to repurchase the Clubhouse and to specifically honor its supposed promises to the residents about Clubhouse access. Indeed, the Attorney General—probably for those very reasons—does not even request that relief. At most, the Attorney General asks for an injunction prohibiting Pettinaro from violating, in the future, the statutes alleged to have been violated here through conduct alleged to have occurred in the past.

I can understand why Pettinaro has framed this as a mootness issue. It contends that, although there might have been a time—say, when Pettinaro first closed the Clubhouse—when injunctive relief might have been appropriate to order Pettinaro to reopen the Clubhouse, that time has now passed. Likewise, one can easily imagine how the Attorney General could have framed a well-pled claim for injunctive relief during the period when Pettinaro is alleged to have been misleading potential purchasers and renters about the status of the Clubhouse.

But this case was not filed until March 8, 2004. By that time, Pettinaro did not even own the Clubhouse. By that time, it had been four years since Pettinaro was last alleged to have made any misrepresentations concerning the Clubhouse. By that time, and as of the time of oral argument, the State had no evidence that the unusual situation that allegedly transpired at the Towne Estates Condominium complex was recurring or was likely to recur anywhere else.[63] Based on these realities, Pettinaro is correct in arguing that the Attorney General has not pled facts that support a claim for injunctive relief.

■■■ The mere fact that the Attorney General has asked for an injunction does not suffice to state a claim within this court's equitable jurisdiction. Rather, a claim for injunctive relief must be supported by the allegation of facts that "create a reasonable apprehension of a future wrong."[64] If there was ever a time when the Attorney General could reasonably have asked this court to use its unique powers of equity to enjoin Pettinaro from violating the rights of residents at the Condominiums, it has long since passed. This court cannot permit its jurisdiction to be invoked simply on the basis of unsubstantiated fear that a legal duty may be breached in an uncertain future. Furthermore, it is not at all clear what purpose would be served by enjoining Pettinaro from violating duly enacted statutes that it is already duty-bound to honor. The State's request for injunctive relief of that

**63.** Although the Attorney General argues that injunction is necessary to prevent Pettinaro from *misleading consumers in connection* with other properties it manages, her complaint makes no mention of any property other than the Towne Estates Condominium complex, and fails to allege facts tending to suggest that Pettinaro is currently making fraudulent or misleading statements in connection with the sale, lease, or advertisement of other properties it manages.

**64.** *See McMahon v. New Castle Associates,* 532 A.2d 601, 605–6 (Del.Ch.1987) ("[O]ne *may not convert a claim for money damages* arising from a breach of a commercial contract or breach of a statutory duty into a claim maintainable in equity by the expedient of asking that the defendant be enjoined from breaching such duty again.").

nature both trivializes equity's role and implicitly suggests that the most powerful expression of a societal prohibition—an express statute forbidding conduct—is somehow insufficient without an "us, too" from the judicial branch.

 The failure of the complaint to state a claim for injunctive relief has another implication, which is that it necessitates dismissal of the Attorney General's claims under the Deceptive Trade Practices Act. Recovery under that Act is contingent upon a valid basis for injunctive relief.[65] The court in *State v. Fallon* held that the Attorney General bringing an action under the Deceptive Trade Practices Act stands in the same position as a person with a trade or business interest in such action, and that in either case, a party must have a "basis" or "standing" to seek injunctive relief, even if such relief is not sought.[66] Here, the State's claims for injunctive relief are not viable. Although a claim for injunctive relief would undoubtedly have existed had Pettinaro continued to engage in deceptive trade practices until this suit was brought, the misleading conduct that the State relies upon for its claims under the Deceptive Trade Practices Act ended no later than the beginning of 1999. Under the Superior Court's decision in *Dionisi v. DeCampli* the failure of a party to be able to state a claim for injunctive relief at the time suit is brought is fatal to claims under the Deceptive Trade Practices Act.[67] The court considered the intent of the Act in reaching its decision:

> The Act is designed to encourage immediate or at least timely enforcement of its provisions to halt unfair or deceptive trade practices between [parties]. . . . It is not a vehicle for damages long after the immediacy of the grievance dissipates. When the press for instant action eases, so does the basis for possible [relief under the Deceptive Trade Practices Act].[68]

Under this reasoning, the lack of a tenable claim for injunctive relief under the Deceptive Trade Practices Act prevents the State from proceeding under that Act for other relief here.

In sum, however one analyzes the complaint's request for injunctive relief, it falls far short of legitimately invoking this court's equitable jurisdiction.[69] There is no other relief sought in the complaint that cannot be obtained by the Attorney General in the Superior Court and, given the absence of basis for equitable jurisdiction, this case will therefore be dismissed unless the Attorney General elects to transfer the case to a court of law under 10 *Del. C.* § 1902.[70]

**65.** See *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63 (Del.1993); *Dionisi v. DeCampli*, 1995 WL 398536 (Del.Ch. June 28, 1995); *State ex rel. Brady v. Fallon*, 1998 WL 283438 (Del.Super.Feb.27, 1998).

**66.** 1998 WL 283438 at *5.

**67.** 1995 WL 398536, at *13.

**68.** *Id.*

**69.** Although the State seeks relief in the form of "restitution," the use of this term in characterizing monetary relief sought is not adequate to state a claim in equity. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 12–1[b] at 12–10 ("While equitable remedies are frequently restitutionary in nature, restitutionary remedies are not the exclusive province of equity. Restitution also is available at law.").

**70.** Per 29 *Del. C.* § 2517, the State may press claims under the Consumer Fraud Act, the Deceptive Trade Practices Act, and the Health Spa Regulation in courts of law. Section 2517(c)(2) specifically authorizes the Attorney General to bring actions under § 2513 of the Consumer Fraud Act and § 2532 of the Deceptive Trade Practices Act. Likewise, 6 *Del. C.* § 4222 of the Health Spa Regulation ex-

## VI. *Conclusion*

For the foregoing reasons, Pettinaro's motion is granted in part and denied in part, as follows:

1. The State's claims under the Consumer Fraud Act and the Deceptive Trade Practices Act that are based on acts before March 8, 1999 are dismissed as untimely under 6 *Del. C.* § 2506. Any claims under the Consumer Fraud Act for acts after March 8, 1999 are not dismissed;

2. The State's claims under Delaware Health Spa Regulation are not dismissed;

3. The State has failed to state a claim for injunctive relief. As a result, a) the State's claims under the Deceptive Trade Practices Act are dismissed for this additional reason, and b) this action shall be dismissed unless the State transfers the case under 10 *Del. C.* § 1902 within thirty days.

The parties shall submit an implementing order within ten days.

---

pressly refers to 29 *Del. C.* § 2517 as establishing the scope of the Attorney General's enforcement duties and powers under that statute. And, 29 *Del. C.* § 2517(c)(2) states that the Attorney General may bring actions in "state courts of competent jurisdiction." Law courts have therefore handled cases under each of these statutes. *See State ex rel. Brady v. Fallon,* 1998 WL 283438 (Del.Super.Feb.27, 1998) (considering an action brought by the State seeking restitution for alleged violations of the Deceptive Trade Practices Act in Superior Court); *State ex rel. Brady v. Gardiner,* 2000 WL 973304 (Del.Super. June 5, 2000) (considering an action brought by the State under the Consumer Fraud Act in Superior Court); *Skeans v. Dover Racquetball & Fitness Club, Inc.,* 1997 WL 33471242 (Del.Com.Pl. Aug.19, 1997) (dismissing a complaint under the Health Spa Regulation on grounds unrelated to jurisdiction).