IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WINDSOR I, LLC, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellant, | § | No. 443, 2019 |
| | § | |
| v. | § | |
| | § | Court Below: Superior Court |
| CWCAPITAL ASSET | § | of the State of Delaware |
| MANAGEMENT LLC, | § | |
| | § | |
| and | § | C.A. No. N18C-06-115 |
| | § | |
| U.S. BANK NATIONAL | § | |
| ASSOCIATION, as TRUSTEE, | § | |
| SUCCESSOR-IN-INTEREST to | § | |
| BANK OF AMERICA, N.A., as | § | |
| TRUSTEE, SUCCESSOR to WELLS | § | |
| FARGO BANK, N.A. as TRUSTEE | § | |
| for the REGISTERED HOLDERS | § | |
| of COBALT CMBS COMMERCIAL | § | |
| MORTGAGE TRUST 2007-C2, | § | |
| COMMERCIAL MORTGAGE PASS | § | |
| THROUGH CERTIFICATES, | § | |
| SERIES 2007-C2, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: August 5, 2020
Decided: September 10, 2020

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED.**

Melvyn I. Monzack, Esquire, Michael C. Hochman, Esquire (*argued*), Monzack Mersky McLaughlin and Browder, P.A., Wilmington, Delaware, *for Appellant*.

Daniel A. O'Brien, Esquire, Venable LLP, Wilmington, Delaware. *Of Counsel*: Gregory A. Cross, Esquire, Brent W. Procida, Esquire (*argued*), Venable LLP, Baltimore, Maryland, *for Appellees.*

**VALIHURA**, Justice:

This is an appeal of the Superior Court's September 27, 2019 decision (the "Opinion")[1] granting a motion to dismiss filed by CWCapital Asset Management LLC ("CWCAM") and U.S. Bank National Association ("U.S. Bank") (together, the "Defendants"). Plaintiff-below, Appellant Windsor I, LLC ("Windsor") is a Delaware limited liability company that owned the 48,000 square foot commercial property and building located at 2201 Fairand Drive in Wilmington, Delaware (the "Property"). The Property was encumbered with debt eventually held by U.S. Bank.

In 2015, after learning that the Property's sole tenant intended to vacate, Windsor sought special servicing to refinance the debt. After nearly two years of negotiation and litigation, CWCAM, the special servicer, offered to sell the loan to Windsor in a proposed transaction for $5,288,000, subject to credit committee approval. The credit committee, however, rejected the transaction, and Defendants filed a foreclosure action against Windsor in 2017. Defendants thereafter held an online auction to sell the loan. A Windsor representative participated in the auction. After the auction, Defendants sold the loan to a third party, WM Capital Partners 66 LLC ("WM Capital"), and Windsor ultimately paid $7.4 million to WM Capital in full satisfaction of the loan.

In its action seeking relief based upon quasi-contractual theories of promissory estoppel and unjust enrichment, Windsor alleged that but for the credit committee's arbitrary rejection of the proposed transaction, Windsor would have purchased the note and

---

[1] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 2019 WL 4733430 (Del. Super. Sept. 27, 2019) [hereinafter *Opinion*].

2

loan nearly a year earlier for over $2,112,000 less than it paid to WM Capital. The Superior Court ultimately held that Windsor failed to state claims for promissory estoppel and unjust enrichment, and that the claims were barred because Windsor's representative had agreed to a general release as part of an auction bidding process.

On appeal, Windsor asserts that the Superior Court erred in five respects: (1) the general release did not preclude Windsor's claims, (2) even if the release barred the claims, it did not include the proposed transaction for $5,288,000; (3) the court erred in dismissing the claim for unjust enrichment; (4) the court erred in dismissing the claim for promissory estoppel; and (5) granting the motion to dismiss constituted an inequitable outcome. Windsor maintains that the Superior Court erred because a question of fact exists as to whether Windsor's representative executed the general release. Defendants argue that the court's ruling was supported by the record, and that the general release is clear and applies to the claims in this case.

We AFFIRM the judgment of the Superior Court for the reasons explained below.

### I. Relevant Facts and Procedural Background[2]

#### A. The Underlying Loan and Prior Litigation

On December 27, 2006, Windsor refinanced debt on the Property by entering into a mortgage and security agreement with CWCapital, LLC for the principal amount of $7.4 million (the "Loan") and executing a promissory note for the benefit of CWCapital, LLC. The note was eventually assigned to U.S. Bank.

---

[2] We take the facts, for the most part, from the Amended Complaint, and the Superior Court's recitation of the facts in its Opinion.

3

Best Buy, the electronics store, was the sole tenant on the Property for about twenty years. In June 2015, Windsor learned that Best Buy planned to vacate the Property. In response, Windsor requested that its Loan be transferred to special servicing because it faced "imminent default." The request was granted, and the Loan was transferred to special servicer, CWCAM. On November 21, 2015, Windsor received a draft "pre-negotiation agreement" from David Smith, a Senior Vice President at CWCAM, discussing the terms under which the parties would negotiate.

Windsor allegedly made several proposals to CWCAM to purchase the Loan but received no response. On December 12, 2016, Windsor filed a complaint for specific performance, injunctive, and other equitable relief in Court of Chancery (the "Chancery Action") seeking to require CWCAM to negotiate with Windsor in good faith. CWCAM moved to dismiss the action, and the court granted the motion on July 31, 2017.[3] In dismissing the action, the Court of Chancery concluded that the pre-negotiation agreement did not impose an enforceable obligation to negotiate, stating that, "when read as a whole, the Pre-Negotiation Agreement is a document that simply establishes rules to govern any discussions that may take place. It does not obligate any party to negotiate or forbear from exercising remedies otherwise available."[4]

---

[3] *Windsor I, LLC v. CWCapital Asset Mgmt., LLC*, 2017 WL 3499919 (Del. Ch. July 31, 2017).

[4] *Id.* at *1. Windsor appealed that decision to this Court on August 16, 2017, but the appeal was later dismissed by stipulation of the parties. *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 327, 2017 (Del.); App. to Answering Br. at B12 (Am. Compl. ¶ 40 n.3).

On April 26, 2017, CWCAM, via email, offered to sell the Loan to Windsor for $5,288,000. The offer, however, was conditional, as it was "subject to credit committee approval, adequate proof of [Windsor]'s ability to fund, execution of appropriate documentation and closing by May 30."[5] Windsor accepted the offer, via email, then drafted a loan acquisition agreement in connection with this "Proposed Transaction" and coordinated with a lender to borrow funds to purchase the Loan. Three weeks later, CWCAM notified Windsor that the credit committee had rejected the Proposed Transaction.

On August 28, 2017, CWCAM, on behalf of U.S. Bank, filed a foreclosure action against Windsor in the Superior Court (the "Foreclosure Action").[6] CWCAM filed a second action in the United States District Court for the District of Delaware against Windsor's guarantors, Robert Stella, Constantine Michell, and Theodore Michell (the "District Court Action"), for their refusal to furnish a letter of credit deposit.[7] On February 15, 2018, the Superior Court stayed the Foreclosure Action and ordered the parties to participate in an alternative dispute resolution process.

*B. The Auction*

Between February 13 and February 15, 2018, CWFS-REDS, LLC, an affiliate of CWCAM, held an online auction to sell the Loan (the "Auction"). Robert Stella, an equity

---

[5] App. to Answering Br. at B13 (Am. Compl. ¶ 44).

[6] *Id.* at B16–B17 (Am. Compl. ¶ 65); *see U.S. Bank Nat. Ass'n v. Windsor I, LLC*, N17L-08-156 ALR (Del. Super.).

[7] App. to Answering Br. at B17–B18 (Am. Compl. ¶ 70); *see U.S. Bank Nat. Ass'n v. Stella*, 1:17-CV-01732 (D. Del.).

owner of Windsor, bid in the Auction on behalf of FCS Lending, LLC.[8]  As a condition of bidding, Defendants assert, and the Superior Court determined, that Stella had executed the "RealINSIGHT Marketplace Auction Sale Terms and Conditions/Bidder Confidentiality" (the "Auction T & C").  The Auction T & C contains the following release (the "General Release"):

> EACH BIDDER RELEASES CW REDS, RI AND THEIR EMPLOYEES, AGENTS, AFFLIATES, DIRECTORS, AND SUBSIDIARIES ("**REPRESENTATIVES**") FROM ANY CLAIMS, WHETHER CURRENT OR FUTURE, AGAINST CW REDS, RI OR THEIR REPRESENTATIVES.  THIS WAIVER IS INCLUSIVE OF ANY AND ALL CLAIMS OF WHICH BIDDER IS CURRENTLY UNAWARE, REGARDLESS OF WHETHER SUCH CLAIMS WOULD AFFECT BIDDER'S RELEASE OF CW REDS AND/OR RI.[9]

Defendants assert, and the Superior Court determined, that in order to accept the terms and conditions, the bidder must scroll through the terms and conditions.

On March 7, 2018, Defendants sold the Loan to third party WM Capital.  Windsor, based on an analytical report, estimated that CWCAM sold the Loan for approximately $4.6 million.[10]  After the sale of the Loan, Windsor paid $7.4 million to WM Capital in order to pay off the Loan and to avoid paying default interest and other penalties.[11]

---

[8] The Amended Complaint notes that FCS Lending, LLC is a "company with some common ownership as Windsor," and was the would-be purchaser in the Proposed Transaction.  App. to Answering Br. at B12 (Am. Compl.¶ 43 n.4).

[9] *Id.* at B462 (Auction T & C).

[10] Defendants assert that it sold the Loan for $5.75 million.  *See id.* at B25 (Am. Compl. ¶102 n.5); *id.* at B119 (Shevlin Sept. 28, 2018 Aff.).

[11] In combination with the payoff to WM Capital, the Superior Court and District Court actions filed by CWCAM were dismissed by stipulation of the parties.  *Id.* at B28 (Am. Comp. ¶ 120 n.7).

*C. The Present Action*

On June 15, 2018, Windsor filed a complaint in the Superior Court for breach of contract, alleging that the Defendants breached an agreement when the credit committee refused to consummate the Proposed Transaction. Defendants filed a motion to dismiss, which the court granted without prejudice on December 12, 2018. At the motion to dismiss hearing, the court stated that although Windsor could not sustain its claims for breach of contract, it could pursue quasi-contractual claims.

Windsor thereafter amended its complaint on December 21, 2018, adding quasi-contractual claims (the "Amended Complaint"). In Count I of the Amended Complaint, Windsor asserted a claim for promissory estoppel. Windsor alleged that CWCAM, as an agent for U.S. Bank, promised to sell the Loan to Windsor, Windsor reasonably relied on CWCAM's promise to sell, and suffered damages as a result of its reliance. More specifically, Windsor alleged that as a result of the wrongful rejection of Defendants' own offer, Windsor suffered damages of no less than $2,112,000, reflecting the difference between the agreed-to purchase price of $5,288,000 and the payment Windsor made to WM Capital of $7,400,000. In Count II, Windsor asserted a claim for unjust enrichment. Windsor alleged that Defendants were enriched because they accrued ten months of servicing fees after CWCAM should have sold the Loan to Windsor, and CWCAM's affiliate received a five percent auction fee. In addition, Windsor alleged that Windsor suffered an impoverishment because Windsor expended time, money and resources in order to timely comply with the closing requirements for the Proposed Transaction.

Defendants moved to dismiss the Amended Complaint in March 2019. Attaching a copy of the Auction T&C to its opening brief, Defendants argued that Windsor had released all claims against it when Stella participated in the Auction. According to Defendants, all participants in the Auction were required to scroll through and accept the Auction T & C, which included the General Release. In addition to the General Release, the Auction T & C contained several paragraphs that referenced numerous, separate terms and conditions, including: "The submission of a Bid serves as verification that the Bidder accepts and agrees to the terms and conditions posted on the Property's webpage at the time of the Bid."[12] Another paragraph provided that:

> It is the responsibility of each Bidder to review the form of purchase agreement, any addenda related to the purchase agreement and related documents (the **"Purchase Agreement"**) accessible on each property webpage (each, a **"Property Webpage"**) prior to placing a Bid. The terms of the Purchase Agreement are non-negotiable and, by placing a Bid on any Property, Bidder agrees to the terms, disclosures, representations, and warranties provided in the Purchase Agreement.[13]

Although the Amended Complaint did not refer to the Auction T & C (or the General Release), and was thus extrinsic to the complaint, Defendants argued that, it, nevertheless, should be considered with their Rule 12(b)(6) motion.[14] Defendants also filed the Affidavit of James P. Shevlin (the "Shevlin Affidavit") with their opening brief. That affidavit

---

[12] App. to Answering Br. at B457 (Auction T & C).

[13] *Id.* at B458. Windsor stated that CWCAM forwarded a Purchase Release to Windsor after the Proposed Transaction that contained a general release. *Opinion*, 2019 WL 4733430, at *3. Windsor argued below that if CWCAM believed the General Release applied to the Proposed Transaction, then CWCAM would not have prepared the Purchase Release. *Id.*

[14] App. to Answering Br. at B145 (Defs.' Opening Br. in Supp. of Mot. to Dismiss); App. to Opening Br. at A86–A98 (Mot. to Dismiss H'rg Tr.).

8

certified the attached Auction T & C as a true and correct copy, and further stated that, "Mr. Stella registered for the Auction and, as a condition of bidding, executed the [Auction T & C].'"[15]

In its answering brief in opposition to the motion to dismiss, Windsor addressed Defendants' argument that "a release executed as a condition of participating in an online auction for the Loan precludes Windsor's claims."[16] It raised four arguments in response, but it did not assert that its representatives did not actually execute the Auction T & C.[17]

Defendants filed their reply brief in support of the motion to dismiss in April 2019. The reply brief included an affidavit from Victor Gutierrez (the "Gutierrez Affidavit"), a Senior Vice President for CWFS-REDS, LLC, who "was directly involved in administering the 2018 auction which included the Loan to Windsor I, LLC."[18] Gutierrez stated in the affidavit that, "a prospective bidder cannot be approved to participate in an auction or place bids unless he or she clicks 'Accept' [after scrolling through the Auction T &C]."[19]

---

[15] App. to Answering Br. at B467 (Shevlin Aff. ¶ 4).

[16] *Id.* at B476 (Pl.'s Answering Br. in Opp'n to Mot. to Dismiss) (internal quotation marks omitted).

[17] Specifically, Windsor argued that: (1) it did not voluntarily and intentionally waive any rights; (2) even if it had, the General Release related to the auction itself, not to the Proposed Transaction; (3) the General Release was not clear and unambiguous; and (4) CWCAM would not have required a second comprehensive release if the General Release applied here. *Id.*

[18] App. to Answering Br. at B560 (Gutierrez Aff. ¶ 2).

[19] *Id*. (Gutierrez Aff. ¶ 7).

On the afternoon of June 6, 2019, Windsor filed an affidavit from Stella (the "Stella Affidavit").[20] Based on our review of the record, this was the first time the issue of whether Stella had actually executed the Auction T & C was raised. Stella stated that the Gutierrez Affidavit "is inconsistent with my recollection of the process,"[21] and that, "[m]y records do not reflect, nor do I recall, ever being presented with the referenced Bidder Registration Certification—or being required to accept the terms and conditions Defendants include in their brief—prior to participating in the Auction."[22] He stated further: "I believe the process employed for my participation in the Auction was different than that of the 'typical' prospective bidder as described in the Reply [Brief]."[23] Finally, he noted: "I would have expected Defendants to include a copy of my electronically-signed copy of [the Auction T & C] as an exhibit to the Reply, if one existed."[24] Thus, the parties disputed the critical fact of whether Stella had executed the Auction T & C.

The Superior Court held a hearing on the motion to dismiss on June 28, 2019. During the hearing, the Court questioned both Windsor and Defendants' counsel about the "dueling affidavits" and noted the limited utility of the affidavits:[25]

> I don't have to rely on your client [Windsor], and I don't have to rely on their client [CWCAM]. I can rely on a tech guy who says what Mr. Stella says is possible, or what Mr. Stella says is impossible . . . . isn't that really more of

---

[20] The Superior Court docket indicates that the motion to dismiss hearing was originally scheduled for June 7, 2019.

[21] App. to Opening Br. at A32 (Stella Aff. ¶ 4).

[22] *Id.* at A32–A33 (Stella Aff. ¶ 6).

[23] *Id*. at A33 (Stella Aff. ¶ 8).

[24] *Id*. at A35 (Stella Aff. ¶ 13).

[25] *Id*. at A95, A98–A102, A123–A126 (Mot. to Dismiss Hr'g Tr.).

10

the answer than having Mr. Stella deposed, and somebody from the defense deposed to see, because then I get nowhere. One is going to say he said, and the other is going to say she said again.[26]

Windsor defended the Stella Affidavit by arguing that "a tech guy" would not have specific knowledge of the access procedures used by Stella, and argued that the affidavits created an issue of fact.[27]

Nevertheless, on September 27, 2019 the court granted the motion to dismiss without expressly referring to the affidavits, holding that Windsor's claims were barred by the General Release. Central to its holding were two key "facts" that were not derived from Windsor's Amended Complaint, but rather, can be found only in the affidavits filed by the Defendants. First, the court determined that, "[a]s a condition of bidding, Mr. Stella executed the [Auction T & C]."[28] No citation accompanies this statement. The Shevlin Affidavit, submitted with the Auction T & C together in connection with Defendants' opening brief, appears to be the source. Paragraph four of the Shevlin Affidavit states: "Mr. Stella registered for the Auction, and, as a condition of bidding, executed the [Auction T & C]."[29]

Second, the court found that, "[i]n order to accept the terms and conditions, the bidder must scroll through the terms and conditions."[30] Based upon our review of the

---

[26] *Id.* at A125–A126.

[27] *Id.* at A126.

[28] *Opinion*, 2019 WL 4733430, at *2.

[29] App. to Answering Br. at B467 (Shevlin Aff. ¶ 4).

[30] *Opinion*, 2019 WL 4733430, at *2.

11

record before us and statements by counsel at oral argument,[31] the only source we see for this assertion is the Gutierrez Affidavit that Defendants filed with their reply brief. Paragraph seven of that affidavit states that, "a prospective bidder cannot be approved to participate in an auction or place bids unless he or she clicks 'Accept.'"[32]

The Stella Affidavit, submitted over a month after Defendants filed their reply brief, attempts to undercut these two key factual assertions. It does so anemically, however, by averring only that Stella's "records do not reflect, nor [did he] recall, ever being presented with the referenced Bidder Registration Certification—or being required to accept the terms and conditions Defendants include in their brief—prior to participating in the Auction."[33] Stella does not say definitively that he did not execute the Auction T & C.

Premised largely on these two findings, the Superior Court determined that Stella had executed the Auction T & C, and it proceeded to address the substantive challenges to the General Release. Ultimately, the court held that "Windsor's claims are barred by the release because the release applied to the Proposed Transaction, is clear and unambiguous

---

[31]    *See*    Oral    Argument    Video,    at    33:18–34:22, https://livestream.com/delawaresupremecourt/events/9239002/videos/209475306::

> JUSTICE VALIHURA: The court found that in order to accept the terms and conditions, the bidder had to scroll through the terms and then click accept. The only place I could find that would be the source of that would be the Gutierrez Affidavit, which you filed with your reply brief. And, as I understand the record, there was no objection below to the court's consideration of that and no argument that that converted your Motion into a summary judgment motion or that it should have been converted into a summary judgment motion. Am I wrong about that?

> MR. PROCIDA: No, I believe you are correct about all of those items, Your Honor.

[32] App. to Answering Br. at B560 (Gutierrez Aff. ¶ 7).

[33] App. to Opening Br. at A32–A33 (Stella Aff. ¶ 6).

and is enforceable."[34]  The court then separately addressed the promissory estoppel and unjust enrichment claims and held that those allegations failed to state a claim.

## II.    *Standard of Review*

This Court reviews the Superior Court's decision to grant a motion to dismiss under Rule 12(b)(6) *de novo* "to determine whether the judge erred as a matter of law in formulating or applying legal precepts."[35]  This Court will "view the complaint in the light most favorable to the nonmoving party, accepting as true its well-pled allegations and drawing all reasonable inferences that logically flow from those allegations."[36]  However, we do not accept "conclusory allegations unsupported by specific facts, nor do we draw unreasonable inferences in the plaintiff's favor."[37]  The grant of a motion to dismiss is only appropriate when the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[38]  Additionally, this Court reviews *de novo* the Superior Court's interpretation of written agreements.[39]

## III.    *Analysis*

Windsor's primary contention on appeal is that the Superior Court erred by granting Defendants' motion to dismiss because the Stella Affidavit presented an issue of fact as to

---

[34] *Opinion*, 2019 WL 4733430, at *6.

[35] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1160 (Del. 2010).

[36] *Id*. (citation omitted).

[37] *Id*. (citation omitted).

[38] *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002)).

[39] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

whether Stella had executed the Auction T & C.[40] We see some merit to Windsor's argument on appeal that the affidavits, filed by both sides, reveal the existence of an issue of a key fact that should have converted the motion to dismiss into one for summary judgment. But adding to the procedural oddity here is that Windsor never objected to the Superior Court's consideration of the Shevlin or Gutierrez Affidavits.[41] Given Windsor's apparent acquiescence in the court's consideration of these documents in the proceedings below, the lack of a firm rebuttal of these affidavits by Stella (who merely averred as to an absence of records and recollection), and the colorable suggestion that the Auction T & C

---

[40] In addition to this alleged procedural error, Windsor reasserts the same substantive claims challenging the General Release that it raised below. *See supra*, note 17. CWCAM denies each argument, contending that Stella had to accept the Auction T & C to place a bid, and that the General Release contained therein is clear and unambiguous. As for the Stella Affidavit, CWCAM counters that (1) the Stella Affidavit lacks credibility; (2) the Superior Court judge actually did consider it during the hearing on the Motion; and (3) the Court was not obligated to consider or address the Stella Affidavit in its written decision.

[41] *See* Oral Argument Video, at 28:11–29:44:

> JUSTICE VALIHURA: One of the key disputed facts is whether Mr. Stella in fact executed the Auction terms and conditions. And at page four of its Opinion the court found as a fact as a condition of bidding Mr. Stella executed the auction terms and conditions. And the court cites to the affidavit of James Shevlin dated February 1, 2019, which I take it that was the date of the filing of your opening brief. So, my question, is that the only place the judge could have obtained that fact, and why didn't your filing of the Shevlin Affidavit convert the motion into summary judgment?

> MR PROCIDA: A couple of observations, your honor. First is that, as was observed by Justice Traynor, there was never a request to do that. Secondly, I think we would be able to have a very interesting debate about the degree to which all of this was integral to the original complaint given the amount of time the original complaint spends dealing with the auction process. However, as was also observed during Mr. Hochman's argument, no objection was made to that before the trial court, and perhaps more importantly for purposes of what we are doing today, that was not an issue that was taken up in the Appellant's brief. So I am not sure that question is one we are dealing with today.

14

document was integral to the claims asserted in the Amended Complaint, we understand why the Superior Court proceeded to address the substantive General Release issues, and ruled that the General Release barred Windsor's two claims. Perhaps another factor that may have influenced the Superior Court's decision was that the parties had been litigating these issues in multiple courts for years and were well familiar with many of the basic facts which appear to be uncontested.

If the General Release were the only ground asserted for dismissal, the better path would have been to convert the motion to one for summary judgment. But the court also considered other, independent grounds for dismissal—namely, that the Amended Complaint failed to state claims for unjust enrichment and promissory estoppel. Because we have some concern with the procedural aspect relating to the court's main ground for dismissal, and because we believe the claims substantively lack merit, as we explain below, we affirm the Superior Court's dismissal of the Amended Complaint based upon those alternative grounds.

*A. The General Release and the Dueling Affidavits*

Although we rule on alternative grounds, we first address the procedural issue which has been the main focus of this appeal, namely, whether the General Release bars Windsor's claim because its representative, Stella, averred that he did not recall assenting to the General Release, and that this issue raises a question of fact necessitating reversal. In most cases, when the Superior Court considers a 12(b)(6) motion, it limits analysis to

15

the "universe of facts" within the complaint and any attached documents.[42] This rule

protects parties from the harm that may be caused by a lack of notice.[43] The court, however,

may consider documents outside the pleadings when "the document is integral to a

plaintiff's claim and incorporated into the complaint," or "when the document is not being

relied upon to prove the truth of its contents."[44] Additionally, "[t]he trial court may also

take judicial notice of matters that are not subject to reasonable dispute."[45]

In this case, Defendants introduced the Auction T & C and the Shevlin Affidavit

with its opening brief in support of its motion to dismiss, and they cited *Geier v. Mozido*

for the proposition that "the Court may consider the terms of the release under Rule

12(b)(6)."[46] Defendants attached the Gutierrez Affidavit to their reply brief. Windsor,

---

[42] *In re General Motors*, 897 A.2d at 168 (citing *Malpiede v. Townson,* 780 A.2d 1075, 1082 (Del. 2001), *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995), and *In re Tri-Star Pictures, Inc.*, 634 A.2d 319, 326 (Del. 1993)).

[43] *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) (citing *In re Morton's Rest. Grp., Inc. S'holders Litig.,* 74 A.3d 656, 658 n.3 (Del. Ch. 2013) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002)), and *State ex rel. Brady v. Pettinaro Enters.,* 870 A.2d 513, 523 (Del. Ch. 2005)); 5C *Fed. Prac. & Proc. Civ.* § 1366 (3d ed.) (In the federal context: "Generally, the harm to the plaintiff when a court considers material extraneous to a complaint on a Rule 12(b)(6) motion is the lack of notice that the material may be considered. Accordingly, when the plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint, the necessity of converting a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

[44] *Vanderbilt Income & Growth Assoc., L.L.C. v. Arvida/JMB Managers, Inc.,* 691 A.2d 609, 613 (Del. 1996) (citing *In re Santa Fe*, 669 A.2d at 69–70).

[45] *In re General Motors*, 897 A.2d at 169 (citing D.R.E. 201(b)); *see In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Noting that this Court has recognized three occasions where a court may consider documents extraneous to a complaint: "(i) when the document is integral to a plaintiff's claim and incorporated into the complaint; (ii) when the document is not being relied upon to prove the truth of its contents; and (iii) when the document, or a portion thereof, is an adjudicative fact subject to judicial notice." (citations and internal quotation marks omitted)).

[46] App. to Answering Br. at B145 (Defs.' Opening Br. in Supp. of Mot. to Dismiss) (citing *Geier v. Mozido, LLC,* 2016 WL 5462437, at *6 (Del. Ch. Sept. 29, 2016)).

instead of objecting to the consideration of the documents, filed its own affidavit challenging factual assertions in those documents. During the hearing, Defendants argued that the Auction T & C document was integral to the suit.[47]

When a trial court considers a document outside the complaint, the motion to dismiss usually is converted into one for summary judgment, which allows the parties to expand the record.[48] The Superior Court did not do that here. Although the court questioned both sides about the "dueling affidavits" and questioned the usefulness of the affidavits, the Opinion cites none of them. Notwithstanding a lack of any explicit reference to the affidavits in the Opinion, certain key facts, which form the basis for the court's holding on the General Release, are only found in the Shevlin and Gutierrez Affidavits. There was no dispute about this at oral argument. Thus, the relevant question presented to this Court is whether the Superior Court's apparent reliance on facts contained only in the

---

[47] *See* App. to Opening Br. at A97–A98 (Mot. to Dismiss H'rg Tr.):

> MR. PROCIDA: Yes. And my view on it, Your Honor—I fully acknowledge that this is an unusual situation, and there [are] arguments both ways. But my view of it was that it is—there is no distance, there is no daylight, there is no way to understand the auction and the allegations pled and their relationship to the allegations of bad faith and arbitrariness in this case without considering the terms under which the auction took place. So, in that way, the allegation of the auction is very much an allegation of some part of those terms and conditions. They don't mention them directly, but the auction has no existence separate and apart from the terms and conditions. And, in that sense, I thought it was appropriate to include them and plead them in a 12(b) context, understanding that they will still be there.

*See also* App. to Answering Br. at B145 (Defs.' Opening Br. in Supp. of Mot. to Dismiss) (arguing that, "the Court may consider documents outside the pleadings which are integral to the plaintiff's claim and incorporated in the complaint.").

[48] *In re General Motors*, 897 A.2d at 168 ("When the trial court considers matters outside of the complaint, a motion to dismiss is usually converted into a motion for summary judgment and the parties are permitted to expand the record.") (citing *Townson*, 780 A.2d at 1090); Super. R. Civ. P. 12(b)(6).

Defendants' affidavits, and its apparent decision to not consider the Stella Affidavit (which attempted to rebut them), resulted in a procedural error requiring reversal.[49]

In *In re General Motors (Hughes) Shareholder Litigation,* this Court reviewed the Court of Chancery's dismissal of a complaint based, in part, on a document extrinsic to the complaint.[50] We held that the Court of Chancery's dismissal was proper because, "[w]ithout the ability to consider the document at issue in its entirety, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure."[51] In addition to the complaint's direct reference to, and characterizations of, the document at issue, the court's decision turned on both the complaint's insufficient allegations and numerous facts subject to judicial notice.[52]

---

[49] Defendants contend that Windsor waived this argument because it was not included in the Opening Brief. Appellees' Answering Br. at 25 n.19.

[50] *In re General Motors*, 897 A.2d at 169 (considering a consent solicitation document in an action challenging the adequacy of the disclosures in that solicitation document).

[51] *Id*. at 169–70 (quoting *In re Santa Fe*, 669 A.2d at 70) (internal quotation marks omitted).

[52] *Id*. at 169; *see also Morrison v. Berry*, 191 A.3d 268, 275 n.20 (Del. 2018) (reviewing Schedule 14D-9 and Schedule TO in the Rule 12(b)(6) context because the complaint expressly refers to and relies heavily upon these two key disclosure documents); *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (this Court held that the Court of Chancery was permitted to consider the extrinsic licensing agreement in the motion to dismiss when it was submitted with defendants' reply brief because it was integral to plaintiff's claim and was incorporated by reference in the complaint); *In re Santa Fe*, 669 A.2d at 69 (holding that the Court of Chancery could consider a proxy statement for plaintiffs' deficient disclosure claim "because the operative facts relating to such a claim *perforce* depend upon the language" of the proxy statement). Moreover, in *Geier v. Mozido, LLC*, the release appears to have been introduced by the plaintiff as an exhibit to the complaint. 2016 WL 5462437, at *4 n.23.

Unlike *General Motors,* Windsor's Amended Complaint did not refer to, quote, or characterize the Auction T & C document at all.[53] The Superior Court, nonetheless, considered the Auction T & C in dismissing the claims based upon the General Release. Given Windsor's lack of objection to the Auction T & C (containing the General Release), the Shevlin Affidavit, and the Gutierrez Affidavit, we understand the trial court's willingness to address the arguments based upon those documents. And given the weakness of the Stella Affidavit, we would not fault the court for declining to give it any weight. But we decline to affirm on the basis of the General Release mainly because we do not wish to create a precedent which could be viewed as relaxing the rules regarding considering matters extrinsic to the complaint in a Rule 12(b)(6) context. Instead, we address the substance of the promissory estoppel and unjust enrichment claims below, and affirm the Superior Court's dismissal on those grounds.

### B. *Unjust Enrichment*

Windsor argues on appeal that the Superior Court erred in concluding that it failed to state a claim for unjust enrichment. The elements of unjust enrichment are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[54] Windsor believes it has stated a claim in alleging that: it reasonably relied upon Defendants' promise to sell the Loan if certain conditions were met (including credit

---

[53] *See generally*, App. to Answering Br. at B3–B120 (Am. Compl.); *see also Opinion*, 2019 WL 4733430, at *5 ("The Amended Complaint does not mention the terms and conditions.").

[54] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

committee approval); Windsor, to its detriment, took action and incurred costs in preparing to purchase the Loan; the credit committee arbitrarily and capriciously rejected the Proposed Transaction in bad faith by selling the Loan to WM Capital ten months after the Proposed Transaction was supposed to close; and, as a result, Defendants unjustly benefitted by collecting ten months of fees on the Loan as well as a 5% auction fee.

However, we agree with the Superior Court that Windsor's claim for unjust enrichment fails. "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[55] The Superior Court explained that Windsor did not plead a scenario under which Defendants were unjustly enriched because:

> Any enrichment that the Defendants received was a result of a sale of a commercial note (and at a discount from face value) that the Defendants' validly held in the first instance. The only damages that Windsor suffered were the costs to obtain a loan in order to consummate the Proposed Transaction. But, the Defendant's conduct in selling the Loan to another buyer did not cause Windsor's damages. This is because the Defendants' sale of the Loan to another buyer did not cause Windsor to spend money to obtain a loan or otherwise enrich the Defendants. Instead, Windsor spent money of its own volition in order to prepare to purchase the Loan and had to pay costs/fees already associated with the original terms and conditions of the Loan.[56]

---

[55] *Id.* (*quoting Fleer Corp. v. Topp Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (citing 66 Am.Jr.2d, *Restitution and Implied Contracts* § 3, p.945 (1973))). *American Jurisprudence* further explains that, "Unjust enrichment describes a recovery for the value of the benefit retained when there is no contractual relationship but when, on the grounds of fairness and justice, the law compels the performance of a legal and moral duty to pay." 66 Am.Jur.2d, *Restitution and Implied Contracts* § 3 (2d ed.).

[56] *Opinion*, 2019 WL 4733430, at *10.

20

We find no error in the trial court's ruling. Here, Defendants suffered a loss when they sold the $7.4 million Loan to WM Capital for less than $6 million. Windsor, on the other hand, paid $7.4 million to WM Capital in order to pay off the principal of the loan and to avoid paying default interest and other penalties. In other words, Windsor repaid what it had borrowed. Moreover, Windsor, as an unsuccessful bidder in the auction, did not pay the auction fees.[57] Consequently, the auction fees do not properly factor into Windsor's claim. As to the ten months of fees accrued and paid to Defendants, Windsor was required to pay those sums under the original terms and conditions of the Loan. Further, we agree that the costs Windsor incurred in connection with preparing to purchase the Loan were paid on its own volition to entities other than Defendants. Accordingly, we hold that the Superior Court correctly dismissed Windsor's claim for unjust enrichment.

*C. Promissory Estoppel*

Windsor also appeals the Superior Court's dismissal of its promissory estoppel claim. Like the unjust enrichment claim, the crux of this claim is that Defendants arbitrarily and capriciously rejected the Proposed Transaction in bad faith. Windsor argues that because it reasonably relied on Defendants' offer to sell the loan contingent on credit committee approval, it is entitled to no less than $2,118,000 in damages, representing the

---

[57] *See* Oral Argument Video, at 14:27–14:55 (Counsel for Windsor clarifying that "[b]ecause Windsor was not the successful bidder it did not pay the auction fee").

difference between the $7.4 million paid to WM Capital and the $5,288,000 it would have paid had the Proposed Transaction been consummated.

To state a claim for promissory estoppel, a plaintiff must prove by clear and convincing evidence that: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[58]

The Superior Court observed that Windsor did not argue that it met the elements of promissory estoppel, but instead, Windsor, citing *Grunstein v. Silva*,[59] argued that that "the only way to avoid injustice is for the Court to allow Windsor to recover" under this theory.[60] The court found that *Grunstein* "does not state that a court will consider injustice in lieu of the element of a promissory estoppel claim."[61] The court then held that Windsor failed because Defendants' conditional offer was not sufficiently definite and certain to state a claim for promissory estoppel, Windsor did not show that Defendants reasonably expected to induce Windsor to action, it did not reasonably rely upon Defendants' alleged promise to affirm the acceptance since a reasonable person would likely have understood

---

[58] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 347–48 (Del. 2013) (citing *Chrysler Corp., (Del.) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1032 (Del. 2003) (quoting *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)).

[59] 2011 WL 378782 (Del. Ch. Jan. 31, 2011).

[60] *Opinion*, 2019 WL 4733430, at *11.

[61] *Id.*

that the offer and acceptance were subject to the credit committee's approval, and it did not show that the court would create injustice by preventing it to recover.[62]

We agree with the Superior Court that Windsor's Amended Complaint fails to state a claim for promissory estoppel. Windsor relies on *1 Oak Private Equity Venture Capital Ltd. v. Twitter, Inc.*,[63] a case we find to be distinguishable. There, plaintiffs, a group of related funds, were working on a pre-IPO share purchase transaction with Twitter before Twitter allegedly terminated plaintiffs' "approved buyer" status, cut plaintiffs out of the transaction, and worked directly with one of plaintiffs' investors to complete the share purchase transaction. Plaintiffs sued on several grounds, including promissory estoppel. As to that claim, the court found adequate plaintiffs' allegation that the defendant promised that plaintiff was an approved buyer for pre-IPO shares, and orally encouraged plaintiffs to continue working on the transaction.[64] Windsor, however, does not allege such a definite and certain promise. Defendants' offer to move forward with the Proposed Transaction, Windsor pleaded, was conditioned on credit committee approval.[65] Although Windsor states that "such approval initially appeared to be a formality,"[66] no allegation suggests that Defendants promised or otherwise led Windsor to believe that would actually be the case.

---

[62] *Id.*

[63] 2015 WL 7776758 (Del. Super. Nov. 20, 2015).

[64] *Id.* at *12 (noting that, "[t]he Amended Complaint alleges that Twitter promised 1 Oak that it was an approved buyer for Twitter pre-IPO shares and orally encouraged 1 Oak to continue to work on the investment transaction.").

[65] App. to Answering Br. at B13 (Am. Compl. ¶ 44).

[66] *Id.* (Am. Compl. ¶ 47).

In fact, Windsor also pleaded that it expected the "review by the credit committee would be substantive and analytical," which undermines its assertion that such approval was a foregone conclusion.[67] As the trial court stated, "Windsor has not shown, with more than conclusory statements, that the Defendants promised to affirm Windsor's acceptance to buy the Loan for $5.3M without rigorous review from the creditors' committee or that the creditors' committee's approval was implicit."[68] Thus, we agree with the trial court that Windsor failed to state a claim for promissory estoppel.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the Superior Court.

---

[67] *Id.* (Am. Compl. ¶ 48).

[68] *Opinion*, 2019 WL 4733430, at *11. To the extent Windsor raises other arguments relating to the credit committee's rejection of the Proposed Transaction, including its allegations premised on the alleged lack of good faith, we have considered them and reject them.

24