**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| BIGLARI HOLDINGS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No.: N24C-06-187 EMD CCLD |
| | ) |
| BRENT FUNSTON, as executor for the estate of LANCE FUNSTON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Submitted: August 14, 2025
Decided: November 26, 2025

*Upon Defendant's Motion to Dismiss*
***GRANTED in part and DENIED in part***

John M. Seaman, Esquire, S. Michael Blochberger, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware, Lori Marks-Esterman, Esquire, Daniel M. Stone, Esqure, Olshan Frome Wolosky LLP, New York, New York. *Attorneys for Plaintiff Biglari Holdings, Inc.*

Richard L. Renck, Esquire, Michael B. Gonen, Esquire, Duane Morris LLP, Wilmington, Delaware, Luke McLoughlin, Esquire, Duane Morris LLP, Philadelphia, Pennsylvania. *Attorneys for Defendant Brent Funston as executor for the estate of Lance Funston.*

**DAVIS, P. J.**

## I. INTRODUCTION

This is a civil action assigned to the Complex Commercial Litigation Division of the Court. Plaintiff Biglari Holdings Inc. ("Biglari") commenced this action against Defendant Brent Funston, as executor ("Defendant" or "Executor") for the estate of Lance Funston ("Decedent" or "Mr. Funston").

Biglari filed its Complaint (the "Complaint") against Defendant on June 21, 2024, asserting a breach of contract claim (Count I) and a fraudulent inducement claim (Count II).[1]

---

[1] *See* Complaint (hereinafter "Compl.") (D.I. No. 1).

Presently before the Court is Defendant's Motion to Dismiss which was filed on August 27, 2024.[2] The parties modified the briefing schedule multiple times throughout 2024 and 2025.[3] Defendant timely filed his Opening Brief in Support of his Motion to Dismiss (the "Motion") on April 18, 2025.[4] Biglari filed its opposition on June 6, 2025 (the "Opposition").[5] Defendant filed his reply brief on July 2, 2025 (the "Reply Brief").[6] The Court held argument on the Motion on August 14, 2025. At the conclusion of the hearing, the Court took the Motion under advisement.

For the reasons set forth below, the Court **GRANTS** the Motion as to Count II and **DENIES** the Motion as to I.

## II. RELEVANT FACTS

### A. THE PARTIES

Biglari is a Delaware corporation with its principal place of business in San Antonio, Texas.[7]

Mr. Funston was a Pennsylvania resident at the time of his death.[8] His last Will and Testament, dated May 25, 2023 (the "Will"), is currently being probated in Orphan's Court in Montgomery County, Pennsylvania.[9] The Will names Mr. Funston's son, Brent Funston, as executor and trustee of the estate.[10] The Executor is a California resident who currently serves

---

[2] *See* Defendant's Motion to Dismiss (D.I. No. 13)
[3] *See* D.I. Nos. 16, 18, 20, 22, 24.
[4] *See* Defendant's Opening Brief in Support of His Motion to Dismiss (hereinafter "Mot.") (D.I. No. 26).
[5] *See* Plaintiff's Answering Brief in Opposition to Defendant's Motion to Dismiss (hereinafter "Opp'n") (D.I. No. 28).
[6] *See* Defendant's Reply Brief in Further Support of his Motion to Dismiss (hereinafter "Reply Br.") (D.I. No. 32).
[7] Compl. ¶ 8.
[8] *Id*. ¶ 9.
[9] *Id*.
[10] *Id*.

as the executor of the Estate of Lance Funston.[11]  The Executor is named as Defendant in this action pursuant to 10 *Del. C.* § 3701.[12]

## B. NATURE OF THE DISPUTE

### 1. *Timeline of Events*

In September 2014, Mr. Funston and his affiliated companies entered into a loan agreement and warrant with CCA Industries, Inc. ("CCA" or the "Company").[13]  CCA is "a Delaware corporation formerly traded on the New York Stock Exchange but traded on the pink sheets since April 2019."[14]  Throughout the transaction, Mr. Funston and his affiliated companies beneficially owned approximately 17% of the Company and were entitled to appoint four of the seven directors of CCA.[15]  As a result, Mr. Funston and his affiliated companies controlled CCA.[16]

The Lion Fund, L.P. ("Lion Fund") is an affiliate of Biglari.[17]  When Mr. Funston acquired control of CCA, Lion Fund was a CCA shareholder.[18]  Specifically, Lion Fund owned 776,259 shares of CCA's common stock (the "CCA Shares"), representing approximately 12.9% of the outstanding common stock.[19]

Sadar Biglari, Lion Fund's Chairman and CEO, is an entrepreneur and investor with decades of experience growing successful businesses.[20]  Mr. Biglari also had a long history and

---

[11] *Id*. ¶ 10.
[12] *Id*.; *see also* 10 *Del. C.* § 3701, stating in relevant part: "[a]ll causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued....)."
[13] *See* Compl. ¶¶ 1, 12.
[14] *See id*.
[15] *See id*. ¶ 12.
[16] *See id*.
[17] *See id*. ¶ 2.
[18] *See id*. ¶ 13.
[19] *See id*.
[20] *See id*. ¶ 14.

familiarity with CCA, having served as CCA's director from 2011 through 2014.[21]  Mr. Funston sought to have Mr. Biglari remain as director of CCA and to maintain Lion Fund's status as a significant stockholder of the Company.[22]

On November 14, 2014, Mr. Funston and Lion Fund entered into a Lock Up and Put Agreement (the "2014 Lock Up and Put Agreement").[23]  The 2014 Lock Up and Put Agreement provides that Lion Fund could not sell or otherwise transfer its 776,259 CCA Shares until the earliest of (a) the sale of the Company; (b) the Company became insolvent; or (c) January 1, 2018.[24]  Lion Fund also agreed that Mr. Biglari would continue to serve as a director for so long as the CCA board nominated him.[25]

In exchange, Lion Fund had the right to sell, and Mr. Funston agreed to purchase, Lion Fund's CCA Shares for $6 per share within thirty days after the end of the Lock Up Period (the "Put Right").[26]  During this period, Lion Fund could exercise its Put Right by giving written notice to Mr. Funston.[27]  Upon receipt, Mr. Funston had an obligation to pay, within seven days, Lion Fund $6 per share for each CCA Share noticed.[28]

Mr. Funston explained his rationale for entering the 2014 Lock Up and Put Agreement to the CCA Board of Directors, stating:

> [t]he additional personal risk of $4.2 million dollars [sic] seemed justified given [Mr. Biglari's] demonstrated record of building shareholder value… [Mr. Biglari] wanted to protect his funds downside, with a three-year put at his investment basis which would give management the time to work to increase CCA's market cap… The benefits to both sides were obvious."[29]

---

[21] See id.
[22] See id. ¶ 15.
[23] See id. ¶ 16.
[24] See id.
[25] Id.
[26] See id. ¶ 17.
[27] See id. ¶ 18.
[28] See id.
[29] See id. ¶ 19.

At the time of the 2014 Lock Up and Put Agreement, CCA shares traded at or around $3.40 per share.[30]

In 2016, Lion Fund sought to transfer the CCA Shares to Biglari, a related entity also controlled by Mr. Biglari; however, the transfer restrictions in the 2014 Lock Up and Put Agreement precluded this.[31]  On June 14, 2016, Mr. Funston, Lion Fund, and Biglari entered into a second agreement regarding the CCA Shares (the "2016 Lock Up and Put Agreement").[32] The 2016 Lock Up and Put Agreement amended and superseded the 2014 Lock Up and Put Agreement.[33]

The 2016 Lock Up and Put Agreement authorizes Lion Fund to transfer the CCA Shares to Biglari and contained the same Put Right as the 2014 Lock Up and Put Agreement.[34] However, the Lock Up period was extended until at the latest January 1, 2019, which had the corresponding effect of extending the Put Period to January 31, 2019.[35]

Mr. Funston represented in the 2016 Lock Up and Put Agreement that he had "the financial ability to bear the economic risk of his investment," and that "at all times during the terms of this Agreement, [Mr.] Funston [would] have sufficient, liquid funds necessary to purchase the [CCA Shares] for [$6 per share]."[36]  At the time of the 2016 Lock Up and Put Agreement, CCA Shares traded at or around approximately $3.26 per share.[37]

As of January 1, 2019, CCA's share price had fallen to approximately $2.24 per share.[38] The Company had not been sold, nor had a bankruptcy event occurred.  Therefore, per the terms

---

[30] *Id.* ¶ 20.
[31] *See id.* ¶ 21.
[32] *Id.* ¶ 22.
[33] *See id.*
[34] *See id.* ¶ 23.
[35] *See id.*
[36] *See id.* ¶ 24.
[37] *Id.* ¶ 28.
[38] *Id.* ¶ 29.

of the 2016 Lock Up and Put Agreement, the Lock Up period expired January 1, 2019, and the Put Period began.[39] Mr. Funston was unwilling or unable to purchase the CCA Shares and sought to extend the Put Period.[40]

On January 30, 2019, the parties executed an amendment to the 2016 Lock Up and Put Agreement (the "2019 Amendment").[41] The 2019 Amendment extended the Put Period to April 30, 2020, in exchange for payment by Mr. Funston to Biglari of $200,000.[42] The 2019 Amendment further provided that if Mr. Funston failed to make the required payment, the 2019 Amendment would instead constitute a Put Right Notice under the 2016 Lock Up and Put Agreement.[43]

Mr. Funston made the payment of $200,000 to Biglari, and both Biglari and Mr. Funston filed Schedule 13D's disclosing the 2019 Amendment and the extension of the Put Period.[44]

On February 5, 2019, the Company announced that it was deregistering from the New York Stock Exchange.[45] Biglari was prohibited from selling any of its CCA Shares for years leading up to the Company's delisting, per the 2016 Lock Up and Put Agreement.[46] This was the precise risk that the Put Right was supposed to protect Biglari against.[47]

In April 2020, Mr. Funston was again unwilling or unable to purchase the CCA Shares during the extended Put Period and sought a further extension.[48] Mr. Funston requested that the parties work on a new deal, but if it was "not in place in 90 days" Mr. Funston would pay

---

[39] *See id.*
[40] *See id.* ¶ 30.
[41] *See id.*
[42] *See id.*
[43] *See id.*
[44] *See id.* ¶ 31.
[45] *See id.* ¶ 32.
[46] *See id.*
[47] *See id.*
[48] *See id.* ¶ 33.

"$100,000 for [a] one year extension, commencing July 30."[49] On or about April 29, 2020, Mr. Funston and Biglari executed a written agreement extending the Put Period through July 31, 2020, with the option for Mr. Funston to extend it further to April 30, 2021, if he paid Biglari $100,000 before July 30, 2020 (the "April 2020 Agreement").[50]

The parties failed to agree to a "new deal" during the 90-day negotiation period and instead entered into a new executed written agreement on or around July 27, 2020 (the "July 2020 Agreement").[51] The July 2020 Agreement provided that if Mr. Funston paid $100,000 by July 30, 2020, the Put Period would be extended until December 31, 2021.[52] Furthermore, the July 2020 Agreement provided that if Mr. Funston failed to make the required payment, the July 2020 Agreement would instead constitute a Put Right Notice under the 2016 Lock Up and Put Agreement.[53]

Mr. Funston made the $100,000 payment, thereby extending the Put Period to December 31, 2021.[54]

On December 14, 2021, Biglari sent Mr. Funston a notice exercising its right under the 2016 Lock Up and Put Agreement, triggering Mr. Funston's obligation to purchase all 776,259 of the CCA Shares for $6 per share.[55] Mr. Funston failed to make the required payment of $4,657,554 to Biglari within seven business days[56] to acquire the CCA Shares.[57]

---

[49] See id.
[50] See id. ¶ 34.
[51] See id. ¶ 35.
[52] See id.
[53] See id.
[54] See id. ¶ 36.
[55] See id. ¶ 37.
[56] The seventh business day was December 23, 2021.
[57] See Compl. ¶ 37.

7

Biglari sent an additional notice on December 30, 2021, exercising the Put Right for all the CCA Shares.[58] Mr. Funston did not make the required payment.[59]

On December 31, 2021, Biglari offered to extend the Put Period to January 7, 2022, in a signed offer (the "December 31 Offer").[60] The December 31 Offer provided Mr. Funston with the option to further extend the Put Period to September 30, 2022, if he paid Biglari $100,000 by January 7, 2022.[61] The December 31 Offer provides that if Mr. Funston did not make the required payment, the December 31 Offer constituted a third notice of Biglari's exercise of the Put Right under the 2016 Lock Up and Put Agreement.[62]

Mr. Funston did not make the required payment by January 7, 2022.[63] Accordingly, by way of its three December 2021 notices, Biglari exercised its Put Right in December 2021.[64]

Mr. Funston did not purchase the CCA Shares as required, allegedly breaching his contractual obligations under the 2016 Lock Up and Put Agreement.[65]

Throughout 2022, Biglari repeatedly engaged with Mr. Funston seeking to enforce the 2016 Lock Up and Put Agreement, which Mr. Funston ignored until October 2022 directing Biglari to his attorneys at Duane Morris.[66] Mr. Funston indicated a desire to structure a payment but never provided a formal offer.[67] Throughout these discussions, Mr. Funston acknowledged that he owed Biglari the funds; however, Mr. Funston claimed not to have the funds necessary to

---

[58] *See id.* ¶ 38.
[59] *See id.*
[60] *See id.* ¶ 39.
[61] *See id.*
[62] *See id.*
[63] *See id.* ¶¶ 40-41.
[64] *See id.*
[65] *See id.* ¶ 42.
[66] *See id.* ¶ 43.
[67] *See id.*

purchase the CCA Shares.[68]  The parties failed to reach a resolution before Mr. Funston died on July 5, 2023..[69]

## 2. The Alleged Breaches

Biglari asserts that the 2016 Lock Up and Put Agreement, as amended, is a valid contract that required Mr. Funston to purchase the CCA Shares for $6 per share if Biglari provided notice exercising its Put Right during the Put Period..[70]  Biglari contends that it provided notice in December 2021, and at all times, fully performed its contractual obligations under the 2016 Lock Up and Put Agreement.[71]

Biglari alleges that Mr. Funston breached the 2016 Lock Up and Put Agreement by failing to purchase the CCA Shares within the time required by the 2016 Lock Up and Put Agreement..[72]  Biglari further contends Mr. Funston breached the 2016 Lock Up and Put Agreement by failing to maintain sufficient liquid funds necessary to purchase the CCA Shares, per his financial representation and covenant..[73]

Biglari alleges it has been damaged in the sum of no less than $4,657,554, plus interest, and that this claim for breach of contract survives Mr. Funston's death and is assertable against Defendant..[74]

## 3. The Alleged Fraud

Executor purportedly made repeated statements that there was insufficient liquid assets in the Funston Estate to comply with Mr. Funston's obligations under the 2016 Lock Up and Put

---

[68] See id. ¶ 44.
[69] See id. ¶ 48.
[70] See id. ¶ 54
[71] See id. ¶ 55.
[72] See id. ¶ 56.
[73] See id. ¶ 57.
[74] See id. ¶¶ 58-59.

Agreement.[75]  Biglari contends that this demonstrates that Mr. Funston's financial representations were false when made and remain false.[76]  Further, Biglari alleges that Mr. Funston made these representations knowingly, or at least with reckless indifference to the truth. Specifically, Biglari maintains that Mr. Funston had no intention of performing the financial covenant to maintain the sufficient liquid funds necessary.[77]

Biglari claims that Mr. Funston's purported inability to pay the Put Purchase Price was a breach of the Representation and Warranty made in the 2016 Lock Up and Put Agreement to "have sufficient, liquid funds necessary to purchase the Aggregate Shares for the aggregate Put Purchase Price."[78]  Biglari alleges that Mr. Funston intended to induce Biglari to enter into the 2016 Lock Up and Put Agreement through false financial representations.[79]  Biglari states it reasonably relied upon Mr. Funston's financial representations and would not have entered into the 2016 Lock Up and Put Agreement without a reasonable expectation that he would be able to exercise the Put Right.[80]

Biglari asserts that Mr. Funston's fraud caused Biglari to be damaged, in an amount to be proven at trial, because, *inter alia*, it was not able to access public markets while it could have.[81] Biglari asserts that the claim for fraudulent inducement survives Mr. Funston's death and is assertable against Executor.[82]

---

[75] *See id.* ¶ 62.
[76] *See id.*
[77] *See id.* ¶ 63.
[78] *See id.* ¶ 45.
[79] *See id.* ¶ 64.
[80] *See id.* ¶¶ 25, 65.
[81] *See id.* ¶ 66.
[82] *See id.* ¶ 67.

### III. PARTIES' CONTENTIONS

#### A. THE MOTION

Executor contends that, under the facts Biglari has alleged, the "Put Right" obligation expired unexercised, or the limitations period for claiming breach of contract has long since elapsed.[83] Further, Executor contends that Biglari cannot succeed because the letters did not form contracts as they lacked necessary legal consideration.[84] Executor maintains that, in either case, and based solely on the Complaint and the documents integral thereto, there is no reasonably conceivable set of circumstances susceptible of proof under the Complaint upon which Biglari can recover, and dismissal is appropriate under Superior Court Civil Rule ("Rule") 12(b)(6).[85]

Executor further contends that Biglari's alternative fraud theory is not sustainable as it is simply a re-characterization of a contract theory and as such is precluded by Delaware's anti-bootstrapping doctrine.[86] Executor further asserts that Mr. Funston's statements about future financials cannot be fraudulent as they are not statements of present facts.[87]

#### B. THE OPPOSITION

Biglari contends that this action is not time barred as its contract claim accrued after July 21, 2021.[88] Biglari notes that Executor's argument that Biglari's Put Right was exercised on January 31, 2019, ignores specific allegations regarding the valid extension of the 2019 Amendment.[89] Biglari contends that each extension of the Put Period was supported by valid

---

[83] *See generally* Mot.
[84] *See id*. at 14.
[85] *See id*.
[86] *See id*. at 1.
[87] *See* Reply Br. at 1.
[88] *See* Opp'n. at 13.
[89] *See id*. at 16.

consideration, and the parties conduct further supports this assertion.[90] Furthermore, Biglari asserts that its Put Right did not expire before it was exercised, as supported by the December Offer.[91]

Biglari also argues that its fraud claim is timely and distinct from its breach of contract claim.[92]

## IV. STANDARD OF REVIEW

When reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must "view the complaint in the light most favorable to the non-moving party, accepting as true all well pleaded allegations and drawing reasonable inferences that logically flow from them," but "decline … to accept conclusory allegations unsupported by specific facts or to draw unreasonable inferences in favor of the non-moving party."[93] "Even vague allegations are considered well-pleaded if they give the opposing party notice of a claim."[94]

"Dismissal is warranted where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[95] But, if the Court engages the standards described and finds the claimant may recover, the Court must deny the motion to dismiss.[96]

---

[90] See id. at 16-17.
[91] See id. at 20.
[92] See id. at 22.
[93] Price v. E.I. DuPont de Nemours & Co., 26 A.3d 162, 166 (Del. 2011).
[94] Veney v. United Bank, 2017 WL 3822657, at *2 (Del. Super. Aug. 31, 2017).
[95] Hedenberg v. Raber, 2004 WL 2191164, at *1 (Del. Super. Aug. 20, 2004).
[96] Riverside Fund V, L.P. v. Shyamsundar, 2015 WL 5004924, at *3 (Del. Super. Aug. 17, 2015); Spence v. Funk & Commc'n Consultants, Inc., 396 A.2d 967, 968 (Del. 1978).

# V.    DISCUSSION

## A. THE MOTION IS DENIED AS TO THE BREACH OF CONTRACT CLAIM (COUNT I).

The Court finds that Biglari provides sufficient evidence in its Complaint to survive a Rule 12(b)(6) challenge. Biglari sufficiently alleges that Mr. Funston breached the 2016 Lock Up and Put Agreement by: (i) failing to purchase the CCA Shares within the time required; and (ii) failing to maintain sufficient liquid funds necessary to purchase the CCA Shares per his financial representation and covenant.

### 1.    The Extension Letters Contained Valid Consideration

A contract must be supported by mutual assent and consideration.[97] "Delaware courts define consideration as a benefit to a promise or a detriment to a promise pursuant to the promisor's request."[98]

Executor contends the letters following the Amendments lack the necessary legal consideration.[99] Executor argues that each letter contemplated: (i) a wire payment from Mr. Funston to Biglari, and (ii) an expansion of the Put Period, not a refraining of any action by Biglari.[100] Executor argues that the letters provide that the Put Period shall be "extended," rather than replaced, highlighting that Biglari's existing obligations were the basis of the "new" contract.[101]

Executor relies on *James J. Gory Mech. Contracting, Inc. v. BPG Residential Partners V, LLC*.[102] *BPG* states that "[p]ast consideration, as opposed to true consideration, however, cannot

---

[97] *Continental Ins. Co. v. Rutledge & Co., Inc.,* 750 A.2d 1219, 1232 (Del. Ch. 2000).
[98] *Id.*
[99] *See* Mot. at 14.
[100] *See id*. at 15.
[101] *See id*.
[102] 2011 WL 6935279 (Del. Ch. Dec. 20, 2011)

form the basis for a binding contract."[103] However, as Biglari points out, *BPG* applies to the "Pre-Existing Duty Rule," under which a "commitment to honor a pre-existing obligation works neither benefit nor detriment that it cannot serve as valid consideration."[104]

Across all the letters, Mr. Funston paid to extend the Put Period, which is sufficient consideration because a promise to extend the period by which money must be paid is valid consideration.[105] The Court discounts Executor's attempt to analyze the adequacy of this consideration because Delaware courts limit inquiry to the consideration's existence.[106] Mr. Funston repeatedly bargained for, paid for, and received numerous extensions of the Put Period (impending $4.7 million liability) on the understanding that Biglari would forbear from exercising its Put Right for the duration of the Put Period.[107] Executor argues that an "understanding" is insufficient to find consideration.[108]

Biglari's implied forbearance should be deemed consideration at this stage of the proceedings. "[A]ctual forbearance is generally evidence of an agreement to forbear, and when viewed in connection with other facts and circumstances relating to the promise, an implied promise to forbear may be established which will be deemed to supply the necessary consideration."[109]

As the Complaint makes clear, Mr. Funston requested and paid for each extension, which Mr. Funston would not have asked nor acted on if he did not reasonably believe it was a benefit to him.[110] Mr. Funston's $300,000 payment to Biglari provides sufficient evidence to show that

[103] *Id.*, at \*2 (citing *Roam-Tel Partners v. AT & T Mobility Wireless Operations Holdings Inc.*, 2010 WL 5276991, at 6\* (Del. Ch. Dec. 17, 2010)).
[104] *See* Opp'n at 20 (quoting *James J. Gory Mech. Contracting, Inc.*, \*2).
[105] *See id.* at 17 (referencing *Hensel v. U.S. Electronics Corp.,* 262 A.2d 648, 650 (Del. 1970)).
[106] *See id.* at 19 (referencing *Schell Bros., LLC v. Pickard*, 2023 WL 2581711, at 4\* (Del. Ch. Mar. 21, 2023)).
[107] *See id.*
[108] *See* Reply Br. at 4.
[109] *See id.* (paraphrasing from *Szymanska v. Equitable Life Ins. Co.*, 183 A. 309, 314 (Del. Super, 1936).
[110] *See* Opp'n at 16; *see also* Compl. ¶¶ 30, 33, 35

each extension was supported by valid consideration. Otherwise, Mr. Funston's payments would be pointless had he not believed he was benefitting in any way.

### 2. *Biglari's Breach of Contract Claim is Not Time-Barred*

Delaware applies a three-year limitation period to contract claims and fraudulent inducement claims.[111] In Delaware, a breach of contract claim accrues at the time of the alleged wrongful act, which is the breach itself.[112]

Executor asserts that the letters do not grant any forbearance which could furnish consideration. The Executor then contends the latest the Put Right could have been exercised was January 31, 2019. Therefore, Executor maintains that the breach of contract claim accrued on January 31, 2019 and is time barred.[113] Executor states that only if the later letters constitute contracts would Biglari possibly obtain a later accrual date that is not time-barred.[114] Executor argues that, even assuming, *arguendo*, the contracts are found to have valid consideration, the claims are time barred.[115]

As the Complaint alleges, Biglari and Mr. Funston extended the Put Period in the 2019 Amendment as Mr. Funston made the required payment, despite Executor's attempt to state otherwise.[116] The parties filed Scheduled 13D's disclosing the 2019 Amendment and the extension.[117] Executor does not address or otherwise explain why Mr. Funston would file this Schedule 13D and pay $100,000 to Biglari had it not been a valid extension.[118] The parties'

---

[111] 10 *Del. C.* § 8106.
[112] *See Isaacson, Stolper & Co. v. Artisan's Sav. Bank*, 330 A.2d 130, 132 (Del. 1974); *see also Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3 62, 77 (Del. Ch. 2013).
[113] *See* Mot. at 16.
[114] *See id.* at 12-13.
[115] *See id*. at 10.
[116] *See* Opp'n at 14; *see also* Compl. ¶¶ 30-31.
[117] *See id.* at 14.
[118] *See* Opp'n at 15.

conduct supports Biglari's allegations that the 2019 Amendment was validly executed and the Put Period was extended.[119]

The parties extended the Put Period twice more, in each case providing Mr. Funston with valuable forbearance of Biglari's exercise of the Put Right.[120] As Biglari alleged in its Complaint, Biglari exercised the Put Right in December 2021 by way of three Put Notices, which Mr. Funston failed to act upon as required by the 2016 Lock Up and Put Agreement.[121] Therefore, the wrongful act could not have occurred until after July 21, 2021, providing Biglari's allegations on a timely claim with sufficient evidence.

### 3. As alleged, Biglari's Put Right Was Exercised Timely

Executor argues, in the alternative, that Biglari's Put Right expired unexercised on December 31, 2021.[122] Executor provides that the letter dated June 27, 2020, describes an extension of the Put Right Period to December 31, 2021.[123] Executor contends the letter in July does not state that the Put Right shall be deemed exercised on December, 31, 2021, in the absence of other extensions.[124] Executor contends that Biglari's acknowledgement in the December 31, 2021, letter that the Put Right was expiring on the same day nullifies the previous letters from December 14 and 30 purporting to invoke the Put Right.[125]

Further, Executor asserts that, within the letter, Biglari was holding off on the decision of whether to exercise the option until a week after the expiration.[126] Executor correctly states that time requirements on options are strictly enforced, and when "an option lapses, the option

---

[119] See id.
[120] See id. at 14; see also Compl. ¶¶ 34-36.
[121] See id. at 14; see also Compl. ¶¶ 37-42.
[122] See Mot. at 16.
[123] See id. at 17; see also Ex. E to Mot., ¶ 3.
[124] See Mot. at 17.
[125] See id.
[126] See id.

becomes void, and all rights under the contract, along with any consideration given, are forfeit."[127] Executor contends that Biglari operated under the misapprehension that it could contrive a retroactive notice, after the Put Period lapses.[128] Biglari did not "un-exercise" the Put Right in the December Offer, allowing the Put Period to lapse. Rather, Biglari provided Mr. Funston with an option to further extend, consistent with the parties' previous conduct.[129]

However, the plain language of the December Offer states that "if the Amendment Payment is not made by January 7, 2022, this letter will constitute as a Put Right Notice under the Agreement…."[130] Here, the December Offer constituted notice while providing Mr. Funston an option to convert the offer to an extension.[131] Mr. Funston did not make the payment of $100,000 to satisfy the extension.[132] Therefore, the December Offer included a timely notice. For these reasons, the Court finds that Biglari alleges sufficient facts to support the breach of contract claim. Accordingly, the Court **DENIES** the Motion as to Count I.

[127] *See id.* (referencing *Morris v. Delmarva Real Estate Holdings, LLC*, 2024 WL 413512, at *7 (Del. Ch. Feb. 5, 2024) (quoting 77 Paul M. Coltoff, *Am. Jur. Vendor* § 44 (2d ed. 2024))).
[128] *See* Reply Br. at 11.
[129] *See id.* at 10; *see also* Opp'n at 21 n.1.
[130] *See* Opp'n at 21; *see also* Ex. F to Mot.
[131] *See* Opp'n at 21.
[132] *See id.*; *see also* Compl. ¶ 40.

**B. THE COURT GRANTS THE MOTION ON THE FRAUD CLAIM (COUNT II).**

Biglari contends Mr. Funston knowingly made false representations, or at a minimum, with reckless indifferent to the truth to induce Biglari to enter into the 2016 Lock Up and Put Agreement.[133] As set forth below, the Court finds that this claim is time barred based on the Complaint's own allegations.

### 1. Bootstrapping

"A contracting party may not 'bootstrap' a breach of contract claim into a fraud claim 'merely by adding the words "fraudulently induced" or alleging that the contracting parties never intended to perform.'"[134] "A bootstrapped fraud claim thus takes the simple fact of nonperformance, adds a dollop of the counterparty's subjective intent not to perform, and claims fraud."[135]

Executor argues that Biglari puts forth the fraud claim by alleging that Mr. Funston, and later the Estate, breached the 2016 Lock Up and Put Agreement and that Mr. Funston "clearly had no intention of performing."[136] Executor contends this type of claim is prohibited "bootstrapping."[137]

Biglari correctly states that Delaware courts will not dismiss a fraud claim pled alongside a breach of contract claim "so long as the claim is based on conduct that is separate and distinct from the conduct constituting breach."[138] "Allegations that are focused on inducement to contract are 'separate and distinct' conduct."[139]

---

[133] *See* Compl. ¶¶ 63-64.

[134] *See Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *5 (Del. Ch. Dec. 21, 1998).

[135] *Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2020 WL 4692287, at *16 (Del. Ch. Aug. 13, 2020)).

[136] *See id.* at 20; *see also* Compl. ¶ 63.

[137] See Mot. at 20.

[138] *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *8 (Del. Super. Apr. 16, 2014).

[139] *ITW Glob. Inv. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2015 WL 3970908, at *6 (Del. Super. June 24, 2015).

Biglari relies on three cases that allowed a fraud claim to coexist with a contract claim when the fraud that was alleged involved separate wrongful conduct and damages.[140] The Court notes that the duplicative allegations in those cases involve extracontractual injuries which could not be remedied by performance of the contractual duties.[141] "Failure to plead separate damages is an independent ground for dismissal."[142]

For example, the Court in *Medlink Health Solutions, LLC v. JL Kaya, Inc.*[143] dismissed the fraudulent inducement claims except as to one defendant who was alleged (with detail) to have induced a settlement agreement based on extracontractual actions.[144] In *Medlink*, a supplier contracted with a shipping company in order to assist with a government contract.[145] The supplier later sued alleging the shipping company breached the settlement agreement, and that it had fraudulently induced the settlement by inflating its reported costs under the original government contract.[146] The two claims were allowed to stand because they depended on different facts, pled with specificity, related to different obligations, and work different injuries compensable by different damages.[147]

Here, Biglari's allegations all relate to Mr. Funston's contractual promise to maintain the ability to perform under the Put Option.[148] The "fraud" and injury is Biglari not obtaining the benefit of its bargain under the same contract for which Biglari claims has been breached.[149] The Court notes that Biglari pleads no extracontractual representation, duty, or damages.[150]

---

[140] *See* Mot. at 20.
[141] *See* Reply Br. at 15.
[142] *See id*. at 14.
[143] 2023 WL 1859785 (Del. Super. Feb 9, 2023).
[144] *See id.* at *9.
[145] *See id*. at *1.
[146] *Id*.
[147] *See id*. at *7.
[148] *See id*; *see also* Opp'n at 22.
[149] *See* Reply Br. at 16.
[150] *See id*.

However, Biglari agreed to lock up its CCA Shares for three years, unable to sell the shares while CCA traded on the public market.[151] This alleged injury or damage differs from Biglari's damages in its breach of contract claim.[152]

A plaintiff is allowed to plead claims in the alternative, which are distinct at this stage of litigation.[153] Therefore, even if Executor is correct that Biglari improperly bootstrapped its fraudulent inducement claim, the Court finds the fraudulent inducement claim would still be permitted as an alternative to its breach of contract claim.

### 2. Future Fraud

"Predications about the future cannot give rise to actionable common law fraud," and to be fraudulent, the challenged representation must be "a statement of present fact."[154] Executor contends Biglari's fraud claim fails this requirement.[155] Executor argues that because the Put Period had not begun, the Put Right was not yet ripe.[156] Therefore, Mr. Funston's statements regarding his financial capacity and liquidity to cover the price of the CCA Shares were statements about Mr. Funston's future financial capacity and liquidity.[157] Executor contends that failure to adhere to this 'financial covenant," is a claim for breach not fraud and such an allegation is directed to events before the three-year statute of limitation.[158]

When Mr. Funston's representations are read as a whole, Mr. Funston represented that (i) at the time of execution he had approximately $4.7 million in liquid assets; and (ii) that he would

---

[151] *See* Opp'n at 25; *see also* Compl. ¶ 32.
[152] *See* Opp'n at 25.
[153] *See Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. ex rel. Heyman*, 2018 WL 3084975, at *15 (Del. Super. June 21, 2018).
[154] *See* Mot. at 20; *see also Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001).
[155] *See* Mot. at 20.
[156] *See id.*
[157] *See id.*
[158] *See id.*; *see also* 10 *Del. C.* § 8106.

maintain that level of liquidity for the duration of the contract.[159]  As Biglari contends, Mr. Funston's representation at closing that he had the liquidity to bear the risk of the Put Right was linked to his future ability to bear Biglari's eventual exercise.[160]  As alleged, Mr. Funston's representations about his financial liquidity were purportedly false when made and, therefore, sufficient to state a claim for fraud.[161]

### 3. Time-Barred

Executor seeks to dismiss the fraudulent inducement claim, alleging that the statute of limitations for Biglari's fraud claim is three years.[162]  Biglari contends this claim is timely because the fraud claim was tolled until Biglari's discovery of the fraud in October 2022.[163]

As discussed, Mr. Funston made financial representations in the 2016 Lock Up and Put Agreement, which Biglari relied on when entering into this agreement.[164]  Biglari did not learn that Mr. Funston had misrepresented his liquidity until October 2022, after Biglari submitted its Put Notice and sought payment from Mr. Funston and/or the Estate.[165]

Delaware is an occurrence-rule jurisdiction where the cause of action for fraud accrues at the at the time the fraud is perpetrated.[166]  Tolling doctrines can delay the running of a limitations period, and Biglari states that under the discovery rule, "the statute of limitations does not begin to run until the discovery of facts 'constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry

[159] See Opp'n at 26; see also Compl. ¶¶ 61-63.
[160] See Opp'n at 26.
[161] See id.; see also Compl. ¶¶ 26-27, 43-47.
[162] See Opp'n at 22.
[163] See id.
[164] See id.
[165] See id.; see also Compl. ¶¶ 24-26, 43-47.
[166] See ISN Software Corp. v. Richards Layton & Finger, P.A., 226 A.3d 727 (Del. 2020); see also Reading Int'l, Inc. v. St. Francis, 2005 WL 1654343, at *1 (Del. Super. June 17, 2005).

which, if pursued, would lead to discovery' of such facts."[167]  Thus, Biglari contends the discovery rule is particularly appropriate here, where the fraud was "inherently unknowable" and Biglari's ignorance of the fraud was "caused by 'concealment or fraud.'"[168]

The Court looks to the Complaint to determine whether to dismiss on timeliness grounds.[169]  When evaluating whether the Complaint's factual allegations, the Court "must draw the same plaintiff-friendly inferences required in a 12(b)(6) analysis.[170]  While the 12(b)(6) analysis is "plaintiff friendly," Biglari must meet its burden of pleading that a tolling exception applies.[171]

The Complaint alleges that Mr. Funston did not reveal his financial inability until 2022 and Biglari had no way to discover such other than from Mr. Funston himself.[172] Thus, the statute of limitations would have been tolled until October 2022, when Mr. Funston finally revealed he did not have the liquidity to purchase the CCA Shares, rendering the claim timely.[173]

However, Executor asserts that Biglari made no claim of tolling in the Complaint and Biglari's failure to properly join the issue of tolling concedes the issue.[174]  Executor contends that even if the Court were to consider tolling doctrines, the fraud claim would still be time-barred because inquiry notice universally limits tolling.[175]

---

[167] *See* Opp'n at 22; *see also Estate of Buonamici v. Morici*, 2010 WL 2185966, at *3 (Del. Super. June 1, 2010).
[168] *See* Opp'n at 23 (citing *Lehman Brothers Hldgs., Inc. v. Kee*, 268 A.3d 178, 186 (Del. 2021)).
[169] *Lebanon Cnty. Employees' Ret. Fund v. Collis*, 287 A.3d 1160, 1193 (Del. Ch. Dec. 15, 2022) (citing *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. Jan. 14, 1993)).
[170] *Id.* (citing *State ex rel. Brady v. Pettinaro Enterprises*, 870 A.2d 513, 524-25 (Del. Ch. 2005)).
[171] *Id.*
[172] *See id.*
[173] *See id.*
[174] *See* Reply Br. at 17-18 (referencing *Jung v. El Tinieblo Int'l Inc.*, 2022 WL 16557663, at *12 (Del. Ch. Oct. 31, 2022)).
[175] *See id.* at 18 (referencing *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 96 (Del. Ch. 2023)).

"Inquiry notice does not require a plaintiff to have actual knowledge of a wrong… a plaintiff is put on inquiry notice when he gains possession of facts sufficient to make him suspicious, or that ought to make him suspicious."[176] Here, Biglari specifically alleges that it was aware that Mr. Funston was seeking to avoid the Put Right obligation "almost immediately" after the contract's inception.[177] Biglari also pleads that "[i]n January 2019, Funston was unwilling or unable to purchase the CCA Shares."[178]

Under Biglari's own alleged facts, Biglari was on inquiry notice that Mr. Funston might lack the financial capacity to purchase the CCA Sharese no later than January 2019.[179] Thus, the statute of limitations ended in January 2022, and this claim is time-barred.

Therefore, the Court **GRANTS** the Motion with respect to Count II.

## VI.    CONCLUSION

For the reasons stated above, the Court **GRANTS in part and DENIES in part** the Motion.

**IT IS SO ORDERED.**

November 26, 2025
Wilmington, Delaware

/s/ Eric M. Davis
Eric M. Davis, President Judge

cc:     File&ServeXpress

---

[176] *See id.* at 18; *see also Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC,* 2010 WL 363845, at *7 (Del. Ch. Jan. 27, 2010).
[177] *See* Reply Br. at 18; *see also* Compl. ¶¶ 27, 63
[178] *See* Reply Br. at 18; *see also* Compl. ¶ 30.
[179] *See* Reply Br. at 19.